IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

JUL 1 5 2015

David J. Bradley, Clerk of Court

| | |
|---|---|
| Maria S., as Next Friend for E.H.F., S.H.F., and A.S.G., Minors, §<br>§<br>*Plaintiff*, §<br>§ | |
| | Civil Action No. 1:13-CV-108 |
| vs. §<br>§ | |
| Ramiro Garza, et al., §<br>*Defendants.* § | |

**MEMORANDUM OPINION AND ORDER**

The Plaintiff in this suit is the next friend of the three surviving minor sons of Laura S., a citizen of Mexico, who is now deceased. Plaintiff claims that Laura S. was removed from the United States without due process of law and alleges that this deprivation of rights caused Laura S.'s death. Plaintiff filed a *Bivens* action and seeks to recover from the immigration officers that effectuated Laura S.'s removal. [Doc. No. 63]. In response, the immigration officers filed a Motion to Dismiss [Doc. No. 67], asserting several grounds they claim warrant the dismissal of Plaintiff's suit. For the reasons described below, Defendants' Motion to Dismiss is **DENIED**.

I.   Background

Plaintiffs allege the following facts in their complaint.[1] Laura S., the mother of three sons, was a citizen of Mexico. [Doc. No. 63 at 3-4]. She never had legal status in the United States. *Id.* The father of two of Laura S.'s sons—Sergio H.—physically abused Laura S. *Id.* at 4. In April 2008, Laura S. obtained a protective order against Sergio H. from a municipal court in McAllen, Texas. *Id.* Sergio H. returned to Mexico and was allegedly working with a drug cartel. *Id.* Sergio H. threatened Laura S. and told her that he would kill her if he ever saw her again. *Id.*

---

[1] When evaluating a Motion to Dismiss, the Court must accept the facts in Plaintiffs' complaint as accurate. Consequently, the Court's recitation of those facts herein should not be taken as a finding by this Court as to the accuracy of those allegations.

On June 8, 2009, Laura S. was traveling in a vehicle with three other passengers near Pharr, Texas when they were stopped by a law enforcement officer for a driving infraction. *Id.* The officer asked the vehicle's passengers for proof of citizenship or immigration status. *Id.* Laura S. and two other passengers were unable to produce the necessary papers, and the law enforcement officer turned them over to Defendant Ramiro Garza, a United States Customs and Border Patrol ("CBP") agent. *Id.* at 5.

Defendant Garza transported Laura S. and the other two passengers to a CBP center near Pharr, Texas. *Id.* While in the vehicle, Laura S. explained to Defendant Garza that her dangerous ex-boyfriend resided in Mexico, and that she feared for her life if she returned there. *Id.* Laura S. wept and begged not to be returned to Mexico. *Id.*

When the group arrived at the CBP center, they were taken into an office for fingerprinting and to complete paperwork. *Id.* The group was joined by Defendant Ruben Garcia and two other unknown Defendants, all CBP agents. *Id.* at 6. Laura S. was weeping and anguished when she spoke with Defendants, and informed them that she feared for her life if she returned to Mexico. *Id.* Although Laura S. informed Defendants of Sergio H.'s threats, Defendants did not question Laura S. about her expressed fears nor attempt to verify or evaluate her risk of harm. *Id.* Defendants did not inform Laura S. of any of her legal rights, such as the right to seek asylum or the right to a hearing before an immigration judge. *Id.*

Rather, Defendants "rushed through the proceedings" and "made it clear to [Laura S.] that she was returning to Mexico immediately, despite her pleas." *Id.* at 7. Defendants presented Laura S. with a number of papers, and told her to sign "here, and here and here." *Id.* Laura S. was not given a chance to read the papers, nor was she told what she was signing. *Id.* Laura S. refused to sign the papers, but Defendants "forcefully demanded that she sign." *Id.* One of the forms Laura S. was forced to sign was a voluntary departure form, a procedure by which an alien may consent to summary removal from the United States. *Id.* at 11. By signing a voluntary departure form, Laura S. waived her right to a deportation hearing and any other forms of relief for which she may have been eligible. *Id.*

After Laura S. and the other two passengers signed the papers, including the voluntary departure forms, Defendant Garza drove them to the international bridge. *Id.* at 8. Laura S. wept on the way to the

2

bridge, telling Defendant Garza that she would not survive the week in Mexico. *Id.* In the early morning hours of June 9, 2009, Defendant Garza "forced" the group to cross the international bridge and return to Mexico. *Id.*

Once she returned to Mexico, Laura S. stayed at her grandmother's house. *Id.* Laura S.'s friends and relatives began "emergency efforts" to get her out of Mexico. *Id.* After learning of Laura S.'s return to Mexico, Sergio H. soon accosted her, "blocking her car and beating her brutally." *Id.* Laura S. was rescued by a relative. *Id.* Several days later, on June 14, 2009, Sergio H. abducted Laura S. and killed her. *Id.*

The present suit was filed on behalf of Laura S.'s three minors sons ("Plaintiffs"). *Id.* at 2-3. Plaintiffs bring a *Bivens* claim against the four CBP agents (collectively, "Defendants") that effectuated Laura S.'s removal from the United States, and seek to recover money damages for the death of their mother. *Id.* at 12-14. Plaintiffs allege that Defendants violated Laura S.'s Fifth Amendment right to procedural due process when they forced her to sign the voluntary departure form that effectuated her return to Mexico. *Id.* at 13. Plaintiffs contend that Laura S. was eligible for various forms of relief under United States immigration law, such as mandatory withholding of removal under the Convention Against Torture or mandatory withholding based on persecution risks. *Id.* at 9. Nevertheless, by allegedly forcing Laura S. to sign a voluntary departure form,[2] Plaintiffs claim that Defendants denied Laura S. access to whatever relief she may have been entitled to and forced her to return to a country where she knew her death was imminent. *Id.* at 10.

In response to Plaintiffs' Complaint, Defendants filed a Motion to Dismiss. [Doc. No. 67]. In their Motion to Dismiss, Defendants assert five separate grounds that they argue warrant the dismissal of Plaintiffs' suit: (1) 8 U.S.C. § 1252(g)'s jurisdictional bar; (2) the absence of a constitutionally-protected right; (3) inapplicability of the *Bivens* doctrine; and (4) qualified immunity. *Id.* For the reasons discussed below, Defendants' Motion to Dismiss is **DENIED**.

---

[2] As with the factual allegations made in the Complaint, this Court's recitation of Plaintiffs' legal allegations should not be taken as conclusions of law made by this Court.

II.    8 U.S.C. § 1252(g) Jurisdictional Bar

In their Motion to Dismiss, Defendants argue that § 1252(g) of the Immigration and Nationality Act bars the Court from considering Plaintiffs' suit. Section 1252(g), entitled "Exclusive Jurisdiction," states:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). Interpreting § 1252(g) narrowly, the Supreme Court has held that it does not bar judicial review of all claims arising from deportation proceedings. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). Rather, § 1252(g) "applies to only three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* (quoting 8 U.S.C. § 1252(g)) (emphasis in original). Illustrating its holding, the Supreme Court offered examples of the many decisions made during the deportation process that would not be barred from judicial review by § 1252(g), including "the decisions to open an investigation, to surveil the suspected violator, [and] to reschedule the deportation hearing . . . ." *Id.*

The three discrete actions described as falling under § 1252(g)'s jurisdictional bar represent distinct components of the deportation process. The first action, "commencing proceedings," occurs after CBP agents apprehend an alien with no legal status in the United States and "file the appropriate charging document with the immigration court." *DeLeon-Holguin v. Ashcroft*, 253 F.3d 811, 815 (5th Cir. 2001). The charging document is served on the apprehended alien, and gives him or her notice of the nature of the proceedings and time to prepare a defense. U.S. Dep't of Justice, Immigration Court Practice Manual at 55. "Adjudicating cases" refers to the actions taken to maintain removal proceedings against an alien,

4

which culminate in a hearing held before an immigration judge charged with "deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a. If the immigration judge finds that an alien has no legal status to remain in the United States, an order of removal is issued. *Id.* The final action referenced in § 1252(g), "executing removal orders," occurs when an illegal alien is removed from the United States pursuant to a court order. *See Sifuentes-Barraza v. Chertoff*, No. 03-51202, 2006 WL 2522143 (5th Cir. Sept. 1, 2006).

Though § 1252(g) has limited judicial review in these three areas, it has not prevented courts from ruling on constitutional claims arising in the deportation context. *Humphries v. Various Fed. U.S.I.N.S. Employees*, 164 F.3d 936, 944-45 (5th Cir. 1999). For example, in *Humphries v. Various Federal U.S.I.N.S. Employees*, the plaintiff brought suit alleging that he had been mistreated while he was in custody pending the execution of his removal order. *Id.* at 939. When determining whether § 1252(g) barred the plaintiff's suit, the Fifth Circuit noted that the plaintiff "would not have been subjected to the alleged mistreatment had the decision not been made to place [him] in detention while awaiting exclusion." *Id.* at 945. Nevertheless, this tenuous connection to "the decision . . . [to] execute [a] removal order" was not sufficient to bring the plaintiff's suit within the purview of § 1252(g). *See id.* Rather, the plaintiff's constitutional claim challenging the treatment he received while in detention bore "no more than a remote relationship" to the initial decision to execute his removal order, and was not barred by § 1252(g). *Id.*; *see also Flores-Ledezma v. Gonzales*, 415 F.3d 375, 381 (5th Cir. 2005) (§ 1252(g) did not bar plaintiff's constitutional challenge to statutory scheme that permitted INS to exercise discretion regarding whether to commence removal proceedings); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) (§ 1252(g) did not preclude the court "from ruling on constitutional challenges to deportation procedures"); *Mustata v. U.S. Dep't of Justice*, 179 F.3d 1017, 1021-22 (6th Cir. 1999) (plaintiffs' due process challenges to deportation procedures not barred by § 1252(g)); *Selgeka v. Carroll*, 184 F.3d 337, 342 (4th Cir. 1999) (plaintiff's procedural due process claim arising in deportation process not barred by § 1252(g)).

Here, the facts of the case do not require the Court to review any of the "three discrete actions" encompassed by § 1252(g). Plaintiffs' allegations do not fall within the purview of § 1252(g)—they do not contend that the CBP agents commenced removal proceedings against Laura S., or that they sought to obtain or execute a final order of removal. Rather, Laura S.'s removal from the United States was effectuated pursuant to the CBP agents' use of voluntary departure. Voluntary departure permits "aliens to depart voluntarily from the United States . . . *in lieu of* being subject to [removal] proceedings . . . ." 8 C.F.R. § 240.25(a) (emphasis added). CBP agents have discretion when deciding to offer an apprehended illegal alien voluntary departure instead of initiating removal proceedings. *See* 8 U.S.C. § 1252(a)(2)(B). Since Laura S. was summarily removed from the United States through voluntary departure, Defendants never commenced removal proceedings against her nor pursued them to a final order of removal. Therefore, the facts of Plaintiffs' case do not require the Court to impermissibly review any of the "three discrete actions" protected by § 1252(g)'s jurisdictional bar.

While the Court concedes that one could argue that the Plaintiffs are ultimately complaining about the Defendants' discretionary decision to *not* commence removal proceedings against Laura S., or of their decision to offer her voluntary departure, Plaintiffs' real challenge is to the constitutionality of the procedures Defendants used to secure Laura S.'s consent to a voluntary departure. Like the situation in *Humphries*, it is true that Laura S. would not have been subjected to the alleged procedural due process violation if it had not been for the Defendants' decision against commencing removal proceedings. As in *Humphries*, however, the alleged procedural due process violation in this case bears "no more than a remote relationship" to the Defendants' decision to offer Laura S. voluntary departure. Plaintiffs' constitutional allegations present an inquiry wholly separate from the Defendants' initial decision to not commence removal proceedings against Laura S. The Court is not asked to review whether Defendants' discretionary decision was appropriate, but whether the procedures used to gain Laura S.'s consent complied with constitutional standards. Though factually related, the procedures used to gain Laura S.'s consent are merely ancillary to the Defendants' discrete decision to offer her a voluntary departure, and

are not encompassed within § 1252(g)'s jurisdictional bar. Defendants' Motion to Dismiss on this point is denied.

III.    Presence of a Constitutionally-Protected Right

Second, Defendants contend that Plaintiffs cannot establish a violation of Laura S.'s constitutional rights as necessary to proceed with their *Bivens* claim. Defendants argue that, because Laura S. did not have the legal status necessary to remain in the United States, she did not possess the constitutional right to a hearing or to choose how her removal from the United States would be effectuated.

This Court agrees that Laura S., as an alien illegally in the country, had no constitutional right to remain in the United States. Nevertheless, "even aliens who have entered the United States unlawfully are assured the protections of the fifth amendment due process clause." *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1036 (5th Cir. Unit B 1982). The "fundamentals of due process" require that an individual be given "notice, hearing, and an appeal" prior to being deported. *Zhang v. Gonzalez*, 432 F.3d 339, 346 (5th Cir. 2005). An individual may waive these due process protections, though, such as by signing a voluntary departure form. By signing a voluntary departure form before removal proceedings have commenced, an individual concedes his removability and agrees to waive his rights to a hearing before an immigration judge. *Nose v. Attorney Gen. of the United States*, 993 F.2d 75, 78-79 (5th Cir. 1993). Any such waiver, however, "must be made knowingly and voluntarily." *Id.* at 79 (emphasis added).

Reviewing facts analogous to those in the present case, the Ninth Circuit held that an individual was denied procedural due process when he did not knowingly and freely sign a voluntary departure form. *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1163 (9th Cir. 2005). In *Salgado-Diaz v. Gonzales*, the plaintiff was removed from the United States pursuant to his signature on a voluntary departure form. *Id.* at 1160. The plaintiff asserted, however, that he "did not agree to leave the country voluntarily" and signed the departure form because the CBP agents represented to him that his signature on the document was necessary to look up his pending immigration proceedings. *Id.* at 1160, 1163. The Ninth Circuit held

that this misrepresentation regarding the effect of plaintiff's signature constituted a deprivation of the plaintiff's procedural due process rights, and essentially "denied [the plaintiff] his day in court." *Id.* at 1163. In a similar situation, the Third Circuit in *Romero-Fereyos v. Attorney General* found that federal agents violated an alien's procedural due process rights when they confiscated his glasses and subsequently had him sign a removal form, even though the plaintiff was eligible for relief from deportation. *Romero-Fereyos v. Attorney Gen. of United States*, 221 F. App'x 160, 164 (3d Cir. 2007). As both of these cases show, any waiver of rights made pursuant to a signature on a voluntary departure form must be effectuated willingly and with full knowledge of the effects of one's actions.

Courts have also issued injunctions to address procedural due process violations stemming from CBP agents' use of voluntary departure forms to effectuate the removal of illegal aliens. For example, in *Orantes-Hernandez v. Meese*, the district court noted that most Salvadoran immigrants apprehended by immigration agents chose to voluntarily return to El Salvador despite the dangerous conditions in the country. 685 F. Supp. 1488, 1494 (C.D. Cal. 1988). Next, the court found that "[t]he widespread acceptance of voluntary departure is due in large part to the coercive effects of the practices and procedures employed by the INS and the unfamiliarity of most Salvadorans with their rights under . . . immigration law."[3] *Id.* According to the court, even if the Salvadoran immigrants expressed a fear of returning to El Salvador, they were routinely denied their procedural due process rights and forced to sign voluntary departure forms. *Id.* The district court permanently enjoined federal immigration officers from employing coercive tactics to expedite the removal of Salvadoran immigrants. *Id.* at 1513-14. Similarly, in *Perez-Funez v. District Director*, the district court found that immigration agents frequently removed unaccompanied minor aliens through voluntary departure agreements. 619 F. Supp. 656, 657-58 (C.D. Cal. 1985). The evidence also showed, however, that the immigration agents routinely failed to explain to the minor children the effects of their signatures on the voluntary departure forms or their rights under

---

[3] The United States Immigration and Naturalization Service ("INS") was an agency of the United States Department of Justice until 2003. In 2003, its functions were transferred to three new entities: U.S. Citizenship and Immigration Services ("USCIS", U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP")

immigration law. *Id.* at 660-61. Holding that these procedures "violate the due process rights of the plaintiff class," the court permanently enjoined federal immigration agents from effectuating minor children's removal through voluntary departure forms without adequately explaining the effects and consequences of their actions. *Id.* at 669-70.

Despite having no legal status in the United States, Laura S. was found in the United States and consequently was entitled to the protections of the Fifth Amendment's due process clause. The Fifth Circuit has repeatedly asserted that the Fifth Amendment's safeguards extend to protect illegal aliens engaged in deportation proceedings. *See, e.g., Zhang*, 432 F.3d at 346; *Nose*, 993 F.2d at 78-79; *Haitian Refugee Ctr.*, 676 F.2d at 1036. In addition to ensuring the provision of certain rights, the Fifth Amendment also guarantees that illegal aliens have the ability to *waive* these rights, provided that any such waiver is made knowingly and voluntarily. *See Nose*, 993 F.2d at 78-79. In the present case, the Fifth Amendment mandated that Laura S. either be provided a hearing before an immigration judge or the right to knowingly and voluntarily waive such a hearing prior to her deportation.[4] Although Laura S. allegedly waived these rights by signing a voluntary departure form, constitutional standards are satisfied only if that waiver was made knowingly and voluntarily.

Plaintiffs claim, however, that Laura S. did not voluntarily waive her right to a hearing before an immigration judge. Rather, Plaintiffs allege that Laura S. was forced to sign a voluntary departure form even though she repeatedly told Defendants that she feared for her life if she returned to Mexico. As in *Salgado-Diaz* and *Romero-Fereyos*, the actions allegedly taken by Defendants in the present case to secure Laura S.'s signature on a voluntary departure form show that she did not knowingly and willingly agree to the waiver of rights. According to Plaintiffs' complaint, Defendants "made it clear to [Laura S.] that she was returning to Mexico immediately, despite her pleas." [Doc. No. 63 at 7]. Defendants allegedly forced Laura S. to sign a number of papers—one of which was a voluntary departure form—but did not explain the contents of the forms nor the effects of her signature. *Id.* These allegations, if true,

---

[4] Indeed, Defendants' Motion to Dismiss concedes that Laura S. had the right to: (1) be placed in removal proceedings under 8 U.S.C. § 1229a; (2) voluntarily depart; or (3) be placed in expedited removal. [Doc. No. 67at 11]. Here, the Plaintiffs claim she received "none of the above" due to Defendants' actions.

would suffice to show that Laura S. did not choose to voluntarily depart the country freely and knowingly, but rather was coerced into giving up her Fifth Amendment procedural due process rights. Thus, Plaintiffs have sufficiently pled the violation of a constitutional right as necessary to support a *Bivens* claim. Defendants' Motion to Dismiss on this point is denied.

IV.    *Bivens* Action

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the plaintiff brought suit against individual federal officers, alleging that the officers violated his Fourth Amendment rights when they performed a warrantless search of his house and arrested him without probable cause. 403 U.S. 388, 389-90 (1971). Ruling on this case, the Supreme Court created a new, but limited, damages remedy that permitted a person "to sue a federal agent for money damages when the federal agent has allegedly violated that person's constitutional rights." *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 622 n. 1 (5th Cir. 2006). In the present case, Plaintiffs' suit is predicated solely on a *Bivens* theory of liability. Plaintiffs seek to recover damages from Defendants for their alleged violation of Laura S.'s right to procedural due process during her deportation proceedings. In response, Defendants argue that the Immigration and Nationality Act, as well as the presence of special factors, counsel against extending a *Bivens* remedy in this case.

Proceeding with a suit premised on a *Bivens* theory of liability is "not an automatic entitlement"; to the contrary, it is disfavored. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). In the almost forty-five years since it decided *Bivens*, the Supreme Court has extended it in only two scenarios: for a due process violation in the employment discrimination context, *Davis v. Passman*, 442 U.S. 228 (1979), and for an Eighth Amendment violation committed by federally-employed prison officials, *Carlson v. Green*, 446 U.S. 14 (1980). By the same token, the Supreme Court has reversed more than a dozen appellate decisions that purported to extend *Bivens* to a new context. *See De La Paz v. Coy*, 786 F.3d 367, 372 (5th Cir. 2015). Therefore, courts must "'respond cautiously to suggestions that *Bivens* remedies be extended.'" *Id.* at 373 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988)).

10

a. New Context

As an initial matter, the Court must decide whether Plaintiffs' suit presents a "new context" for the extension of a *Bivens* remedy. *See Hernandez v. United States*, 757 F.3d 249, 272 (5th Cir. 2014) *vacated in part and reinstated in part on reh'g en banc*, 785 F.3d 117 (5th Cir. 2015). *Bivens* remedies are not extended on an amendment-by-amendment basis. *Id.* The Supreme Court has instead mandated that courts use a context-specific approach when evaluating the extension of a *Bivens* remedy. *See Corr. Servs. Corp. v. Malesko*, 34 U.S. 61, 68 (2001). Essentially, courts are charged with examining "each new 'potentially recurring scenario that has similar legal and factual components.'" *Hernandez*, 757 F.3d at 272 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 572 (2d Cir. 2009) (*en banc*)). If the Court finds that Plaintiffs' case presents a new context, a full *Bivens* analysis must be made.

The Fifth Circuit has not considered whether a *Bivens* remedy extends to a scenario like that presented in the instant case. It has, however, considered cases that share certain features with the present action. In the immigration context, two Fifth Circuit cases have allowed a *Bivens* claim to proceed to seek remedy for physical abuse allegedly committed against immigration detainees. *See Martinez-Aguero*, 459 F.3d at 620; *Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987). In neither of these cases, though, did the Fifth Circuit explicitly decide "whether border patrol agents can be *Bivens* defendants." *De La Paz*, 786 F.3d at 373. Despite their lack of specificity, the Fifth Circuit does "defer to both of these prior decisions, to the extent that they permit *Bivens* actions against immigration officers who deploy unconstitutionally excessive force when detaining immigrants on American soil." *Id.*

In the two most recent *Bivens* cases occuring in an immigration context, the Fifth Circuit has reached contrary results. In *De La Paz v. Coy*, it declined to extend a *Bivens* remedy to a claim involving allegations of Fourth Amendment violations. *See De La Paz*, 786 F.3d at 380. Specifically, the court refused to create a *Bivens* remedy to allow the plaintiffs—both illegal aliens—to seek damages for allegedly unlawful stops and arrests conducted by CBP agents. *Id.* at 369-71. In *Hernandez v. United States*, however, the Fifth Circuit initially extended a *Bivens* remedy in a suit involving a claim against "a federal law enforcement agent for his conscience-shocking use of excessive force across our nation's

11

border." *Hernandez*, 757 F.3d at 272-73. In *Hernandez*, the defendant, a CBP agent, was standing in the United States when he shot and killed a teenage boy standing across the border in Mexico. *Id.* at 255. *Hernandez* was not an "immigration case," though—when the boy was shot, he was not attempting to immigrate into the United States or otherwise enter the country. *Id.* at 274. The Court notes that certain portions of the Fifth Circuit's opinion in *Hernandez* were later vacated at an *en banc* hearing. *See Hernandez v. United States*, 785 F.3d 117, 120 (5th Cir. 2015).

Although similarities may be drawn between the present case and those described above, the scenario presented in the instant action differs on several fundamental issues. The Fifth Circuit has been presented with *Bivens* cases involving the excessive use of force by CBP agents, as in *Martinez-Aguero* and *Cannatella*. The present case, although involving similar defendants, does not involve allegations of physical abuse, though it does involve allegations of coercion. While in *Hernandez* the *Bivens* action stemmed from the death of a Mexican citizen allegedly caused directly by the actions of a CBP officer, the death of Laura S. was actually caused by a Mexican citizen in Mexico. Finally, the Fifth Circuit in *De La Paz* analyzed a *Bivens* claim in the immigration context stemming from CBP officers' apprehensions of illegal aliens, but did not address issues concerning Fifth Amendment procedural due process. The instant action, while containing certain aspects of the preceding cases, presents a context that has not yet been considered: whether a plaintiff may bring a *Bivens* claim for damages against CBP agents for a procedural due process violation that occurred in the United States and allegedly led to the death of a Mexican citizen in Mexico at the hands of another Mexican citizen.

  b. Extending *Bivens* Action

Having decided that the present case presents a new scenario, the Court "must decide whether to extend a *Bivens* remedy." *De La Paz*, 786 F.3d at 372. The first step in this inquiry is to ask "whether any alternative, existing process for protecting the constitutionally recognized interest amounts to a convincing reason for the Judicial Branch to refrain from providing and new and freestanding remedy in damages." *Minneci v. Pollard*, 132 S. Ct. 617, 618 (2012) (quoting *Wilkie*, 551 U.S. at 550). Second, the

Court then asks whether "special factors counsel[] hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396.

### i.  Alternative Remedies

The purpose of the "alternative remedies" inquiry is "to determine whether Congress has explicitly or implicitly indicated 'that the Court's power should not be exercised.'" *De La Paz*, 786 F.3d at 375 (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)). The main question for this analysis is whether "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the created of a new judicial remedy." *Bush*, 462 U.S. at 388. To justify denying the imposition of a *Bivens* remedy, it is not necessary that an alternative remedial scheme provide a damages remedy identical to *Bivens*. *De La Paz*, 786 F.3d at 377. Rather, so long as a plaintiff has "an avenue for some redress," the courts need not step in to create an independent remedial scheme. *Malesko*, 534 U.S. at 69.

Courts analyzing the advisability of a *Bivens* remedy in the immigration context have necessarily began their "alternative remedies" inquiry with the Immigration and Nationality Act ("INA"). *See De La Paz*, 786 F.3d at 375; *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2011). The federal government reigns supreme in the realm of immigration and through the INA it has "established a substantial, comprehensive, and intricate remedial scheme in the context of immigration." *Arar v. Ashcroft*, 585 F.3d 559, 572 (2nd Cir. 2009). Enacted in 1952, the INA has frequently been amended by Congress in the intervening sixty-three years. *See De La Paz*, 786 F.3d at 377. But "[d]espite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement." *Id.*

Denying the claim in *De La Paz*, the Fifth Circuit focused heavily on the INA as a complex remedial scheme that counseled against the imposition of a *Bivens* remedy in the plaintiffs' case. *De La Paz*, 786 F.3d at 375-78. The plaintiffs in *De La Paz*, illegal aliens, alleged that CBP agents unlawfully stopped their vehicles and arrested them in violation of their Fourth Amendment rights. *Id.* at 370-71. In

its analysis, the Fifth Circuit noted that the INA "intricately prescribes" removal procedures, as well as multiple levels of appellate review for final immigration decisions. *Id.* at 375.[5] Further, the Fifth Circuit emphasized that the INA included "provisions specifically designed to protect the rights of illegal aliens," including the rights allegedly violated in that case.[6] *Id.* at 376. Finally, the Fifth Circuit stated that the INA "maintains its own standards of conduct by training individuals in those standards and 'establish[ing] an expedited, internal review process for violations of such standards.'" *Id.* at 376 (quoting 8 U.S.C. § 1357(a)(5)).[7] Declining to extend a *Bivens* remedy to the plaintiffs' claims, the Fifth Circuit held that the INA is "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations." *Id.* at 377-78. Such a system, the Fifth Circuit stated, "'should not be augmented by the creation of a new judicial remedy.'" *Id.* at 378 (quoting *Bush*, 462 U.S. at 388).

Similarly, in *Mirmehdi v. United States*, the Ninth Circuit focused heavily on the INA when it declined to extend a *Bivens* remedy to a wrongful detention claim in the immigration context. 689 F.3d at 980. Like the Fifth Circuit in *De La Paz*, the Ninth Circuit began its "alternative remedies" analysis by focusing on the "complexity and comprehensiveness" of the INA. *Id.* at 982. The Ninth Circuit also emphasized that the plaintiffs in the case took "full advantage" of the immigration remedies available to them through the INA. *Id.* Thus, the Ninth Circuit also declined to extend a *Bivens* remedy, basing its decision on the presence of the "extensive remedial procedures available to and invoked by [the plaintiffs] . . . " through the INA. *Id.* at 983.

In both *De La Paz* and *Mirmehdi*, the courts' decisions to deny *Bivens* remedies relied extensively on the comprehensiveness of the INA scheme and the remedies it made available to redress the plaintiffs' grievances. On this issue, however, the factual allegations in this case differ markedly. For the plaintiffs

---

[5] *See, e.g.,* 8 U.S.C. § 1229 (initiation of removal procedures); 8 U.S.C. § 1229a (removal procedures); 8 U.S.C. § 1229c (voluntary departure); 8 C.F.R. § 1003.1(b) (appellate review of immigration decisions).

[6] Specifically, the Fifth Circuit pointed out that the INA mandates that federal agents may only search a person or his possessions if they "have reasonable cause to suspect that grounds exist for denial of admission to the United States . . . ." *De La Paz*, 786 F.3d at 376 (quoting 8 U.S.C. § 1357(c)). Similarly, the Court emphasized that federal agents "can only make an arrest if they 'ha[ve] reasonable grounds to believe that the person to be arrested has committed or is committing' a felony or immigration violation." *Id.* (quoting 8 U.S.C. § 1357(a)(2)-(5)).

[7] In regards to the available review process, individuals can file complaints regarding actions taken by CBP officers and those officers can be prosecuted criminally for violations of statutory or constitutional law. *De La Paz*, 786 F.3d at 376-77 (citing 8 C.F.R. § 287.10; *United States v. Brugman*, 364 F.3d 613, 614 (5th Cir. 2004)).

in *De La Paz* and *Mirmehdi*, the INA was available for them to seek redress. In the present case, the Defendants' allegedly wrongful actions prevented Laura S. from utilizing the INA's comprehensive remedial scheme. Plaintiffs argue that Laura S. would have been eligible for various forms of relief from deportation, such as mandatory withholding based on persecution risks in Mexico.[8] Nevertheless, by allegedly coercing Laura S. to sign a voluntary departure form, Defendants essentially denied her access to any remedies that may have been available. It is illogical for Defendants to deny an individual access to a remedial scheme, then claim protection from suit based on the presence of that remedial scheme. Thus the INA is not an "alternative remedial scheme" that justifies denying the imposition of a *Bivens* remedy in this case.[9]

This conclusion finds support in the Second Circuit's decision in *Arar v. Ashcroft*. 585 F.3d 559 (2nd Cir. 2009). In *Arar*, the plaintiff filed a *Bivens* action challenging the government's policy of extraordinary rendition after he was removed to Syria by INS agents and allegedly tortured for information regarding terrorist networks. *Id.* at 565-67. In its "alternative remedies" analysis, the Second Circuit emphasized that "the government took . . . actions that impaired [the plaintiff's] timely ability to seek the judicial review normally afforded under the INA and to receive any meaningful relief." *Id.* at 570. The Second Circuit concluded that, because the plaintiff was prevented from accessing the INA's remedial scheme, "any reliance on the INA as an alternative remedial scheme presents difficulties." *Id.* at

---

[8] This Court takes no position on these claims at this juncture.

[9] Further, the typical remedies individuals seek through the INA would be of little value to the Plaintiffs in this case. Claims challenging the constitutionality of deportation proceedings are typically brought by the individual actually engaged in the deportation proceedings. *See, e.g., Silos v. Holder*, 538 F. App'x 426, 432 (5th Cir. 2013) (plaintiff claimed that his incriminating statements made during deportation proceedings were coerced and could not be used against him in violation of his due process rights); *Olabanji v. I.N.S.*, 973 F.2d 1232, 1234-35 (5th Cir. 1992) (plaintiff challenged whether his deportation proceedings complied with due process requirements when he was not allowed to cross-examine witnesses who testified against him). The INA provides substantial remedies to this class of plaintiffs, such as a stay of deportation or a grant of asylum. The Plaintiffs here, however, do not and cannot seek the type of remedy the INA provides—rather, they seek redress for the death of their mother. The INA, which is not designed to remedy this type of harm, does not present Plaintiffs with an alternative remedial scheme. *See also Argueta v. United States Immigration and Customs Enforcement*, No. 08-1652 (PGS), 2009 WL 1307236 (D. N.J. May 7, 2009) (INA was not a remedial scheme precluding a *Bivens* remedy because plaintiff did not challenge his removability, and thus his constitutional claims would not go before an immigration court).

573. The Second Circuit did not fully explore this prong of the *Bivens* inquiry, though, since the presence of "special factors" in the case justified denying the imposition of a *Bivens* remedy. *Id.*

Aside from the INA, Plaintiffs lack any alternative remedy for the violation of Laura S.'s constitutional rights. "[F]ederal law enforcement agencies," "federal homicide statutes," and "criminal civil rights statutes" are insufficient to remedy Plaintiffs' alleged harms. *See Hernandez*, 757 F.3d at 274. Rather, these procedures "at most represent a mere 'patchwork' of remedies insufficient to overcome *Bivens*." *Wilkie*, 551 U.S. 554. A suit in state court also presents no alternative remedy to Plaintiffs, because plaintiffs "ordinarily *cannot* bring state-law tort actions against employees of the Federal Government." *Minneci*, 132 S. Ct. at 623 (emphasis in original). Aside from a *Bivens* remedy, no alternative remedial scheme is available to provide redress for Plaintiffs' alleged harms. The Court thus proceeds to the second prong of its *Bivens* analysis.

### ii.  Special Factors Counseling Hesitation

The next step in the *Bivens* analysis requires the Court to determine whether "any special factors counsel hesitation." The *Bivens* decisions itself provides "little guidance on what qualifies as a special factor." *Hernandez*, 757 F.3d at 275 (citing *Bivens*, 403 U.S. at 396). In *Hernandez*, [10] the Fifth Circuit provided some guidance on this issue and listed some of the "special factors" other courts have identified as precluding a *Bivens* remedy: sensitive government work in the military context; actions taken during the War on Terror; and the workability of a cause of action. *Id.* (citing *Wilkie*, 551 U.S. at 555; *United States v. Stanley*, 483 U.S. 669, 683-84 (1987); *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012)). Particularly relevant to the present case, the *Hernandez* court noted that the Ninth Circuit had previously identified "'immigration issues' writ large as necessarily creating a special factor counseling hesitation." *Id.* (quoting *Mirmehdi*, 689 F.3d at 982). Focusing on the "complexity and comprehensiveness" of the

---

[10] Fifth Circuit jurisprudence provides little guidance regarding *Bivens* claims in the immigration context. Thus although the Fifth Circuit's *Bivens* analysis in *Hernandez* was later vacated, the Court may rely on the Fifth Circuit's delineation of *Bivens* law in *Hernandez* to assist in the analysis of Plaintiffs' claim. *See United States v. Cisneros*, 456 F. Supp. 2d 826, 839 (S.D. Tex. 2006) (citing *Marathon Oil Co. v. Ruhrgras*, 145 F.3d 211, 225 n.23 (5th Cir. 1998)) ("A vacated decision, while persuasive, is no longer binding precedent.")

INA scheme, the Ninth Circuit in *Mirmehdi* held that "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation . . . .'" *Mirmehdi*, 689 F.3d at 982 (quoting *Arar*, 585 F.3d at 574). Declining to disrupt the INA's comprehensive remedial scheme and its balance of competing governmental interests, the Ninth Circuit held that the presence of immigration issues in *Mirmehdi* counseled against the extension of a *Bivens* remedy.

Though the present case also involves immigration issues, the presence of these factors alone does not necessarily prevent the extension of a *Bivens* remedy. First, the Fifth Circuit has previously declined to follow *Mirmehdi*'s categorical designation of immigration issues as a "special factor counseling hesitation." *See Hernandez*, 757 F.3d at 265. Specifically, the Court in *Hernandez* stated that the Ninth Circuit's designation "unjustifiably extends the special factors identified in *Arar* well beyond that decision's specific national security 'context of extraordinary rendition.'" *Id.* (quoting *Arar*, 585 F.3d at 574). Though the Fifth Circuit ultimately held that *Hernandez* was "not an immigration case," it also stated that it "would not follow *Mirmehdi*'s analysis" even if immigration issues were present. *Id.* at 274-75. Thus in the present case, too, the presence of an immigration issue, in and of itself, does not lead one to conclude that an extension of a *Bivens* remedy should be denied.

Second, although the INA is intended to operate as a comprehensive immigration scheme, courts have previously intruded into its domain to ensure that deportation proceedings comport with constitutional standards. *See Orantes-Hernandez*, 685 F. Supp. at 1513-14; *Perez-Funez*, 619 F. Supp. at 669-70. As discussed in the above section, California district courts have twice entered injunctions barring the INS from using coercive tactics or misrepresentations to secure signatures on voluntary departure forms, and to ensure that the aliens signing the forms were aware of the consequences of their actions. *Id.* Similarly, the Fifth Circuit in *Haitian Refugee Center v. Smith* upheld an injunction barring the INS from using procedures that impeded aliens' ability to seek asylum. 676 F.2d at 1031-32. Aliens engaged in deportation proceedings are often unfamiliar with United States immigration law and do not speak English, and are thus particularly vulnerable to coercive tactics or misrepresentations that may deprive them of their constitutional rights. *See Lanuza v. Love*, No. C14-1641 MJP, 2015 WL 11282132

(W.D. Wash. March 20, 2015) ("If a *Bivens* remedy is not available wherever a non-citizen has the ability to seek review of an immigration decision, there is little to deter immigration officials from presenting false evidence or testimony during immigration proceedings or from otherwise compromising the integrity of such proceedings . . . ."). Thus it is often necessary for courts to exercise their judicial power in this area to ensure compliance with constitutional standards and to protect the rights of aliens in this country.

Third, as noted in *Hernandez*, the "Supreme Court has recently written to emphasize the strong national interest Congress has in protecting aliens from mistreatment." *Hernandez*, 757 F.3d at 276 (citing *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012)). Specifically, the Supreme Court has stated that "[p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 132 S. Ct. at 2498. In *Arizona v. United States*, this national interest in aliens' rights justified a uniform immigration policy instituted at the federal level. *Id.* at 2498-99. In *Hernandez*, the Fifth Circuit noted that this same interest "militates in favor of the availability of some federal remedy for mistreatment at the hands of those who enforce our immigration laws." *Hernandez*, 757 F.3d at 276. Thus the presence of immigration issues does not singularly require the denial of a *Bivens* remedy. Rather, a *Bivens* remedy may be necessary to ensure compliance with the INA and constitutional standards and to protect the rights of a particularly vulnerable class.

Aside from issues of immigration law, other concerns identified by the Fifth Circuit regarding the extension of a *Bivens* remedy do not counsel hesitation in this case. In *De La Paz*, the Fifth Circuit noted that a *Bivens* remedy for the plaintiffs' Fourth Amendment violations was unlikely to provide any meaningful compensation. *De La Paz*, 786 F.3d at 378-79. Even though the plaintiffs may have been searched and arrested without the necessary "reasonable suspicion" required by the law, their damages were likely to be minimal "precisely because they ha[d] no right not to be detained." *Id.* at 379. Because the plaintiffs were illegal aliens, they were removable regardless of whether their apprehensions violated their Fourth Amendment rights, and would thus be entitled to little compensation. *Id.* In the present case, however, the damages to remedy the alleged harm would not necessarily be minimal. Assuming that the

Plaintiffs can demonstrate all the elements of their claim, including causation, they would be entitled to recover damages for the death of their mother—an injury more concrete and compensable than the Fourth Amendment injuries in *De La Paz*.[11]

The *De La Paz* opinion also expressed concerns about "deter[ing] agents from vigorous enforcement and investigation of illegal immigration." *Id*. The facts of *De La Paz* warranted this concern, since the extension of a *Bivens* remedy to cover illegal stops and arrests would likely make immigration agents overly-cautious when exercising their duty to apprehend illegal aliens. The extension of a *Bivens* remedy in the present case is unlikely to create a similar burden on those charged with enforcing immigration laws. First, the procedures used to apprehend and arrest suspected illegal immigrants are wholly separate from those involved in securing voluntary departures. Unlike *De La Paz*, the Court in the present case is not asked to second-guess the judgments made by immigration agents during the apprehension of illegal aliens—judgments often made in tumultuous situations that leave little or no time for careful deliberation. Rather, the Court here is simply asked to review whether certain established constitutional procedures were violated. Second, the Court's analysis of the procedures used to secure Laura S.'s consent to voluntary departure will not alter or increase the duties of immigration agents in future voluntary departure proceedings.  Immigration agents already have the duty to refrain from using undue pressure or coercion when questioning aliens. Finally, protecting aliens' due process rights is an area in which courts have previously intervened to ensure compliance with constitutional laws. *See Haitian Refugee Center*, 676 F.2d at 1031-32; *Orantes-Hernandez*, 685 F. Supp. at 1513-14; *Perez-Funez*, 619 F. Supp. at 669-70. Though the previously-cited cases effectuated broad relief in the form of injunctions issued against the INS, the courts did not express concerns that their oversight in the area of voluntary departure would create a chilling effect regarding the enforcement of immigration laws. Thus the facts of the present case similarly do not give rise to concerns regarding the continued enforcement of immigration laws.

---

[11] Defendants in a catch-all argument suggest that Laura S.'s claims are not cognizable in the courts of the United States. The Court will take up this and any other remaining issues not resolved by this Order if and when any parties file a Rule 56 motion.

Finally, the Fifth Circuit has also expressed concerns that a *Bivens* remedy in the immigration context would "yield a tidal wave of litigation." *De La Paz*, 786 F.3d at 379. In *De La Paz*, the Court reasoned that it would be an "easy exercise" for aliens to file suits alleging that there had been "no reasonable suspicion for their stops, arrests, or detentions." *Id.* at 380. Such litigation, the court explained, would "cripple immigration enforcement with the distraction, cost, and delay of lawsuits . . . ." *Id.* The same concern is present to some extent in the instant case. An extension of a *Bivens* remedy to Plaintiffs' claim may seem to pave the way for others who initially acquiesced to a voluntary departure, but later have a change of heart and seek to re-litigate that departure or claim damages based upon that departure. Hypothetically, by merely alleging confusion or coercion, an alien could proceed with a federal case challenging his voluntary departure and ultimately costing the government significant time and resources in an area that it can least afford it. Such a suit would likely devolve into a swearing match between the opposing parties and could truly impede the proper administration of border protection.

While this prospect would counsel against the extension of a *Bivens* remedy, this case presents several unique factors that would significantly limit its precedential value to those seeking to challenge their own voluntary departures. First, the claim in the present case is not brought by Laura S. Were Laura S. alive to challenge her voluntary departure, redress would be properly sought through the INA rather than through a *Bivens* claim. The INA is a remedial scheme designed specifically to remedy harms caused by a coerced voluntary departure, such as by issuing a stay of deportation. Thus the extension of a *Bivens* remedy in the current case will not aid plaintiffs seeking to challenge their *own* voluntary departures— rather, those plaintiffs can properly seek redress through the INA.

Second, Laura S.'s allegedly expressed fears of being sent back to Mexico, if true, clearly had merit. Less than a week after returning to Mexico, Laura S. was killed by the same person she had allegedly told Defendants that she feared. Plaintiffs are not alleging that Laura S. asserted vague, unverifiable fears—but rather concrete fears eventually proved to be accurate. Finally, if Plaintiffs are denied an extension of a *Bivens* remedy for the violation of Laura S.'s procedural due process rights, then Plaintiffs have absolutely no recourse for the alleged harms they suffered. Had Laura S. lived, she would

have been able to seek recourse for the alleged due process violations through the INA's remedial scheme. It is nonsensical to conclude that, because her fears were actualized and resulted in her death, the estate of Laura S. and her children are therefore without a remedy.

In conclusion, a *Bivens* remedy is the only remedy available to the Plaintiffs in this suit—no other alternative remedial scheme would redress their harms. Further, given this very unique fact pattern, no special factors counsel hesitation and persuade against the imposition of such a remedy in this case. Therefore, the Court extends a *Bivens* action in this specific context in which the Plaintiffs assert a claim for the death of their mother allegedly caused by the deprivation of her procedural due process rights during deportation proceedings. Defendants' Motion to Dismiss on this point is denied.

## V.   Qualified Immunity

Finally, Defendants assert that Plaintiffs' suit should be dismissed because of the doctrine of qualified immunity. Qualified immunity insulates government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To avoid qualified immunity, a plaintiff must satisfy both prongs of a two-prong test. *E.A.F.F. v. Gonzalez*, 600 F. App'x 205, 209 (5th Cir. 2015). "First, a court must decide whether a plaintiff's allegation[s], if true, established a violation of a clearly established right." *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004). Second, "a court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident." *E.A.F.F.*, 600 F. App'x at 209.

A defendant's assertion of qualified immunity "'alters the usual . . . burden of proof.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). When a government official asserts the defense, "the burden shifts to the plaintiff to show that the defense is not available." *Id.* The plaintiff therefore bears the burden of proof to show "a genuine and material dispute as to whether the official is entitled to qualified immunity." *Id.*

In regards to the first prong of the qualified immunity analysis, the Plaintiffs' allegations, taken as true, establish a violation of Laura S.'s clearly established constitutional rights. As discussed above, the Fifth Circuit has repeatedly held that illegal aliens are entitled to procedural due process in deportation proceedings. *See Zhang*, 432 F.3d at 346; *Nose*, 993 F.2d at 78-79; *Haitian Refugee Ctr.*, 676 F.2d at 1036. The Due Process Clause "forbids the state from 'arbitrarily . . . causing an alien who has entered the country . . . illegally to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States.'" *United States v. Benitez-Villafuerte*, 186 F.3d 651, 656 (5th Cir. 1999) (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)). Though an alien may waive her rights under the Due Process Clause, any such waiver must be made knowingly and voluntarily. *Nose*, 993 F.2d at 79.

Here, Plaintiffs' allegations claim that Laura S. did not knowingly and willingly sign the voluntary departure form. Rather, Plaintiffs allege that Defendants coerced Laura S. into signing the form and giving up any rights she may have had to seek relief from deportation. As courts have previously held, an involuntary or coerced waiver of rights is not effective and constitutes a deprivation of procedural due process. *See, e.g., Salgado-Diaz*, 395 F.3d at 1163 (INS agents misrepresented effect of alien's signature on voluntary departure form, violating his procedural due process rights); *Romero-Fereyos*, 221 F. App'x at 164 (federal agents violated the plaintiff's procedural due process rights when they confiscated his glasses and had him subsequently sign a removal form); *Orantes-Hernandez*, 685 F. Supp. at 1494 (court entered injunction to prevent INS agents from using coercive tactics to gain aliens' consent to voluntary departures); *Perez-Funez*, 619 F. Supp. at 657-58 (court entered injunction to ensure that INS agents explained effects of voluntary departure form to illegal aliens). Satisfying the first prong necessary to waive Defendants' qualified immunity, Plaintiffs allegations, taken as true, establish a violation of Laura S.'s clearly established right to procedural due process.[12]

---

[12] The recent *en banc* decision by the Fifth Circuit in *Hernandez* does not alter this conclusion. In that case, the question was whether a Mexican citizen in Mexico had clearly established constitutional rights. The present case involves a Mexican citizen in the United States, albeit illegally, whose rights were allegedly violated in the United States.

The second prong of the qualified immunity analysis requires the court to evaluate whether Defendants' conduct was objectively reasonable in light of clearly established law at the time of the incident. For this inquiry, "the central concept is that of 'fair warning.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). A defendant's conduct is not objectively reasonable if "prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quoting *Hope*, 536 U.S. at 740). When analyzing prior decisions, the Court "considers the status of the law both in our circuit and in our sister circuits at the time of the defendants' actions." *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010).

Here, prior decisions have given Defendants reasonable warning that coercing illegal aliens to sign voluntary departure forms violates those aliens' constitutional rights. The Fifth Circuit has repeatedly held that illegal aliens are entitled to due process protections in immigration proceedings, including the right to a hearing. *See Zhang*, 432 F.3d at 346; *Nose*, 993 F.2d at 78-79; *Haitian Refugee Ctr.*, 676 F.2d at 1036. In *Salgado-Diaz v. Gonzalez*, the Ninth Circuit considered a case with facts similar to those in the present case. 395 F.3d at 1163. The plaintiff in *Salgado-Diaz* alleged that his due process rights were violated when INS agents misrepresented the effect of his signature on a voluntary departure form, instead telling him that it was necessary to look up his pending immigration proceedings. *Id.* at 1160, 1163. The Ninth Circuit held that these actions constituted a deprivation of the plaintiff's procedural due process rights, and essentially "denied [the plaintiff] his day in court." *Id.* at 1163; *see also Romero-Fereyos*, 221 F. App'x at 164 (federal agents violated the plaintiff's procedural due process rights when they confiscated his glasses and had him subsequently sign a removal form). Similarly, two decisions from district courts in California have issued injunctions to ensure that the INS's voluntary departure procedures comply with constitutional standards. *See Orantes-Hernandez*, 685 F. Supp. at 1494; *Perez-Funez*, 619 F. Supp. at 657-658. The court in *Orantes-Hernandez* considered facts similar to the allegations in the present case, and found that INS agents were routinely coercing El Salvadoran immigrants into signing voluntary departure forms even though the El Salvadorans often expressed a fear of returning to their native country. *Orantes-Hernandez*, 685 F. Supp. at 1494. *See also Haitian Refugee*

23

*Ctr.*, 676 F.2d at 1032-1032 (Fifth Circuit upheld an injunction barring the INS from using procedures that impeded aliens' ability to seek asylum). In fact, this Court has not found, nor has it been cited to, any case from any jurisdiction that holds that an officer can coerce an illegal alien into giving up her rights.

As this recitation shows, it is well-established in this circuit that deportation proceedings must conform to the requirements of the Due Process Clause. Further, cases considering scenarios similar to that alleged in the present case have routinely held that illegal aliens cannot be coerced into waiving their Fifth Amendment right to procedural due process. Thus Defendants in the present case were given a "fair warning" that their alleged conduct, if true, was not objectively reasonable.

To conclude, Plaintiffs' allegations suffice to waive Defendants' qualified immunity; or, more likely when the Defendants contest the allegations, raise an question of fact for the jury. *See Waganfeald v. Gusman*, 674 F.3d 475, 483-84 (5th Cir. 2012) (If the Court does not resolve qualified immunity before trial, it is submitted to the jury, and the jury is charged with determining the reasonableness of the defendant's conduct by construing the facts in dispute.). Nevertheless, before the issue of qualified immunity in this case is resolved or deemed a jury question, the Court requires further factual development to ensure that the allegations in the present case will be supported by evidence sufficient to raise a question of fact. The Fifth Circuit has prescribed the procedure for district courts to follow if further factual development is necessary to ascertain the applicability of qualified immunity in a case. *See Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014). First, "a district court must . . . find 'that the plaintiffs[sic] pleadings assert facts which, if true, would overcome the defense of qualified immunity.'" *Id*. at 485 (quoting *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)). Second, if the court requires further clarification of the facts to rule on qualified immunity, "it may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'" *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (quoting *Lion Boulos v. Wilson*, 834 F.2d 504, 507-08 (5th Cir. 1987)); *see also Zantiz v. Seal*, No. 14-30069, 2015 WL 727996 (5th Cir. Feb. 20, 2015). This discovery order must "identify any questions of fact [the district court] need[s] to resolve before it would

be able to determine whether the defendants were entitled to qualified immunity." *Zapata*, 750 F.3d at 485.

As discussed above, the allegations contained in Plaintiffs' complaint, if taken as true, are sufficient to overcome Defendants' qualified immunity defense. The Court has no way of knowing at this stage if the Plaintiffs can prove any of the allegations they have made. Further, there are significant issues of causation which will also need to be resolved. The former could rule out (or in) immunity—the latter could obviously dispose of the entire case. Because the Court needs further factual development before fully resolving the issue of qualified immunity, it will issue a narrowly tailored discovery order aimed at uncovering only the facts necessary to rule on Defendants' defense. Defendants' Motion to Dismiss on this point is denied.

## VI.   Conclusion

In their Motion to Dismiss [Doc. No. 67], Defendants assert four grounds they argue warrant the dismissal of Plaintiffs' suit. As discussed above, the Court finds that none of the four grounds warrant the dismissal of Plaintiffs' suit. Defendants' Motion to Dismiss [Doc. No. 67] is **DENIED**. All discovery in the suit is stayed pending the Court's issuance of a discovery order tailored to uncover the facts necessary to resolve the issue of Defendants' qualified immunity. The Parties are to meet and confer and see if they can agree on a proposed discovery order. The result of that meeting should be reported to the Court by July 31, 2015.

SIGNED this 15th day of July, 2015.

Andrew S. Hanen
United States District Judge

25