United States District Court
Southern District of Texas
**ENTERED**
July 21, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA  S., | § | |
| As next friend for | § | |
| E.H.F., S.H.F., and A.S.G., minors, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 1:13-CV-108 |
| | § | |
| JOHN  DOE, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

This case presents one of the most lamentable set of circumstances that this Court has ever been called upon to address.   A young woman who was living and working in the United States, albeit illegally, who was by all accounts otherwise law abiding and was providing for her family to the best of her ability, was returned to her native Mexico and was soon thereafter killed.  No one involved in this matter—not the parties, not the lawyers, and certainly not the Court—has anything but a profound sense of sadness about the disastrous chain of events that ended in the decedent's murder.   The Plaintiffs lost their mother, and their family lost an individual whom they, no doubt, cherished and loved.

This is a case in which there will be no winners regardless of which way the Court rules. The parties and the Court are faced with a situation that can only be described as sorrowful: a young woman was killed, her estranged boyfriend has been convicted and jailed, and the survivors are left to deal with what remains.  This lawsuit is no doubt part of an attempt to do just that—provide support for the young woman's children and to help provide some sense of closure for all.  While those involved must cope with their loss, the law requires that the Court

1

remain objective.  The lawyers in this matter have done their best to represent their respective clients.  The Court will now address the pending motions, as it must, without bias or sympathy.

## I. Procedural History

Pending before the Court is Defendants' Motion for Summary Judgment [Defs.' Mot. For Summ. J., Doc. No. 118], Plaintiffs' Response [Pls.' Resp, Doc. No. 123], Defendants' Reply in Support [Defs.' Reply, Doc. No. 129], and Plaintiffs' Surreply [Pls.' Surreply, Doc. No. 137].

Defendants previously filed a motion to dismiss, which this Court denied.  [Memo Op. & Order, Doc. No. 81].  Rejecting the Defendants' argument that Laura Karina Flores Salazar ("Laura S.") had no protected constitutional rights at stake, the Court ruled that Laura S.— though an illegal alien—was entitled to Fifth Amendment protection while in the United States in the custody of Custom and Border Patrol ("CBP") officials.[1]  [*Id.* at 22].  After identifying the clearly established rights at stake, the Court ruled as a matter of law that a waiver of those rights obtained through coercion would not be objectively reasonable in light of clearly established law. [*Id.* at 23].

The Court subsequently allowed limited discovery on the issue of qualified immunity. The Defendants have now filed a motion for summary judgment alleging: (1) that Agent Ruben Garcia ("Agent Garcia") should be granted judgment as a matter of law, (2) that all Defendants are protected by qualified immunity, and (3) that Plaintiffs have not pleaded a legally cognizable claim.  [Defs.' Mot. for Summ. J., Doc. No. 118].

The Plaintiffs moved to strike part of Defendants' Motion for Summary Judgment as Plaintiffs believed that Defendants impermissibly moved for summary judgment on the causal link between the Defendants conduct and Laura S.'s murder.  [Doc. No. 121].  Among other

---

[1] The Court, while using Laura S. to identify the deceased, notes that in certain testimony she is frequently referred to by her nickname "Karina" and in some places she is referred to as "Laura Flores."  Indeed, this is the name she used when signing Form I-826 which lies at the heart of this case.

topics, the Defendants' Motion highlighted the great difficulty Plaintiffs would face in proving that Defendants' behavior was the proximate cause of Laura S.'s death were this suit to proceed past the qualified immunity stage.[2]   Nevertheless, the Court denied the motion to strike, clarified that the sole issue before the Court on summary judgment would be qualified immunity, and explained that the Court would only consider those parts of the pleadings that relate to the issue of qualified immunity.  [Doc. No. 122].  Consistent with that order, the Court will consider only the issues related to qualified immunity that have been raised in Defendants' Motion for Summary Judgment.  The Court waited on the United States Supreme Court to rule in the cases of *Hernandez v. Mesa*, ___U.S. ___, 15-118, 2017 WL 2722409 (U.S. June 26, 2017) and *Ziglar v. Abbasi*, ___U.S. ___, 15-1358, 2017 WL 2621317 (U.S. June 19, 2017) as both cases contained issues which could have impacted this case.  The Supreme Court released both cases during the last two weeks of its term leaving no impediment to this Court's ruling.

## II. Factual Background

While most of the key facts are in dispute, some facts are either agreed to or conceded for purposes of this Motion.  The Plaintiffs in this case are the three surviving children of Laura S. Laura S. was born in Mexico, and despite having no legal status in the United States, lived here at various times in her life.  For many years, Laura S. suffered physical abuse at the hands of her then boyfriend and the father of two of the Plaintiffs, Sergio Misael Hernandez ("Sergio H.").  In

---

[2] Defendants' Motion for Summary Judgment referenced several other issues that pertain to this case including (1) whether Laura S.'s death in Mexico at the hands of a private actor is a cognizable due process violation, (2) whether a special relationship between the decedent and Defendants existed and whether there was a "state created danger," and (3) whether there is extraterritorial application of the Fifth Amendment.  This order does not address these issues as none of these issues were actually grounds raised as a basis for the summary judgment requested by the Defendants in their motion (although they were argued in detail in their responsive pleading).  These issues were not only inappropriately referenced, but also are beyond the scope of the immunity issue that was the limited issue specified by prior orders of this Court.  That being said, inextricably intertwined with the question of whether a triable issue of fact exists with regard to the immunity defense is whether Agent Garcia actually, personally violated Laura S.'s rights.   Therefore, though perhaps technically distinct from the qualified immunity analysis, the Defendants have properly raised the issue of whether Plaintiffs may even sustain a suit against Agent Garcia pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

2008, Sergio H. threatened to kill Laura S.  In response, Laura S.—fearing for her life—obtained a protective order against Sergio H. from a municipal court in McAllen, Texas.[3]  At some point, prior to the key events covered by this Motion, Sergio H. returned to Mexico and was allegedly working for a drug cartel.

Though Sergio H.'s physical proximity was no longer a problem for Laura S. given that she remained in the United States (albeit illegally), Plaintiffs claim that Sergio H. still posed a danger to her as he threatened Laura S. that he would kill her if he ever saw her again. According to Plaintiffs, Laura S. was worried that Sergio H. would follow through on his threat and murder her if she was deported to Mexico.  The claims at bar result from the events preceding Laura S.'s death, while she was in CBP custody at CBP's processing center in Weslaco, Texas.

On the early morning of June 8, 2009, Laura S. was driving a car near Pharr, Texas with three passengers: her cousin Elizabeth Alvarez ("Alvarez") and friends Arturo Morales ("Morales") and Saray Cardiel ("Cardiel").  The four were allegedly on their way to a popular 24-hour hamburger restaurant around 2:00 AM when they were stopped by a police officer for a driving infraction.  The officer asked the four passengers for proof of citizenship or immigration status.  Alvarez had a "laser visa" which allowed her to legally cross back and forth from Mexico and the United States.[4]  Laura S., Cardiel, and Morales were unable to satisfy the officer's request, and the officer subsequently notified CBP.  According to Plaintiffs, Laura S., fearing

---

[3] Plaintiffs have attached a copy of the protective order to their response.  [Pls.' Ex. 14, Doc. No. 124–14 at 2].  The Defendants have pointed out that the protective order expired on June 12, 2008, nearly a year before the incident motivating this lawsuit occurred.  [*See id.*]

[4] A "laser visa" or Border Crossing Card is a laminated card the size of a credit card which allows Mexican citizens to cross into the United States.  U.S. Dep't of State, Bureau of Consular Affairs, *Border Crossing Card*, https://travel.state.gov/content/visas/en/visit/border-crossing-card.html (last visited July 7, 2017).

deportation, began to weep and told the officer that Sergio H. would harm her if she was forced to return to Mexico.

The officer released the group, minus Alvarez, to Agent Ramiro Garza, a CBP agent ("Agent Garza").  Since Laura S. had been driving the vehicle when stopped, Alvarez stayed behind with the police officer and waited for her mom and aunt to pick her up.  Laura S. apparently told Agent Garza a similar story—that she feared returning to Mexico because of Sergio H. and that she needed additional time to produce her protective order.  Agent Garza placed Laura S., Cardiel, and Morales in his vehicle, and transported them to a CBP processing center in Weslaco, Texas.  Laura S. allegedly continued to weep, plead, and beg for release during the entire ride to the CBP processing center.

Agent Garza, Agent Garcia, and other unknown CBP agents processed Laura S., Cardiel, and Morales with varying degrees of involvement.  Morales was processed separately from Laura S. and Cardiel.  Agent Garza and another CBP agent fingerprinted and interviewed Laura S. and Cardiel and presented each of them with a Form I-826.  This form requires an illegal alien to make a choice from three options, one of which results in voluntary return to one's country of origin.[5]  Laura S. reviewed and signed the Spanish version of Form I-826.  [*See* Defs.' Ex. 2, Doc. No. 119–2 at 4].

---

[5] Voluntary return is a term of art denoting "administrative voluntary departure," a process by which an alien may be removed prior to and in lieu of removal proceedings.  *See* 8 U.S.C. § 1229c (a)(1).  Voluntary return is conducted by either a CBP officer or an officer for Immigration and Customs Enforcement ("ICE") and it allows certain aliens to return to their home country voluntarily by requesting such on Form I-826.  *See, e.g.*, *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 619 (9th Cir. 2006).  Voluntary departure, though also authorized by 8 U.S.C. § 1229c and often times referred to interchangeably as voluntary return, refers to an entirely different removal process.  Voluntary departure denotes a form of removal relief granted during the conclusion of removal proceedings under 8 U.S.C. § 1229a whereby an alien chooses to depart the United States voluntarily rather than through formal removal pursuant to an order of an immigration judge.  *See, e.g.*, *Rosario-Mijangos v. Holder*, 717 F.3d 269, 279 (2d Cir. 2013).

Form I-826 includes a "Notice of Rights."[6]  The Court quotes the translation included as part of the summary judgment evidence.  Form I-826 states in part:

> You have been arrested because immigration officers believe that you are illegally in the United States.  <u>You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States.  If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date.  In the alternative, you may request to return to your country as soon as possible, without a hearing.</u>
>
> You have the right to contact an attorney or other legal representative to represent you at your hearing, or to answer any questions regarding your legal rights in the United States.  Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee.  You have the right to communicate with the consular or diplomatic officers from your country.  You may use a telephone to call a lawyer, other legal representative, or consular officer at any time prior to your departure from the United States.

[*Id.* at 5] (emphasis added).

Under the "Notice of Rights" section on Form I-826 is a section titled "Request for Disposition."  This section offered Laura S., as with all similarly situated immigrants, a choice of three options: (1) request a hearing before the immigration court to determine whether she could stay in the United States, (2) indicate that she believed that she would be harmed if she returned to Mexico and have her case referred to the immigration court, or (3) acknowledge her unlawful presence and be repatriated to Mexico.  [*See id.*]  The options were presented to her in a list format and separately delineated.  [*See id.*]  Next to each option is a checkable blank box designed to show the selection of one option to the exclusion of the others.  [*See id.*]  Adjacent to the blank box for each of the three options is a corresponding blank line for the alien to initial the selected option.  [*See id.*]  The first two options offer the opportunity to remain in the United

---

[6] The record includes an affidavit attesting to the accurate translation of the English version of Form I-826 into Spanish.  [Defs.' Ex. 2, Doc. No. 119–2 at 6].  The affidavit was sworn before a notary public in Cook County, Illinois on February 5th, 2014.  [*Id.*]  It is unclear from the record who the affiant was.  No party has disputed the accuracy of the translation.

States pending a hearing (although one might have to remain in custody).   The third choice obviously results in one being repatriated back to one's home country.

Laura S. placed an "x" in the box corresponding to the voluntary return option and initialed on the line next to the checked box affirming her selection.   [*See id.* at 4].   Laura S.'s full signature also appears under her initials, along with the date on which she signed.   [*See id.*] The actual form Laura S. signed follows in its entirety:

| U.S. Department of Homeland Security | Notificación de Derechos y Solicitud de Resolución |
|---|---|

Subject ID:280232470     Event No:MER0906000071
FINS #:11997033

Expediente No: _____

Nombre: FLORES-SALAZAR, LAURA KARINA

### NOTIFICACIÓN DE DERECHOS

Usted ha sido detenido porque los oficiales de Inmigración opinan que se encuentra en los Estados Unidos ilegalmente.  Tiene derecho a una audiencia ante el Tribunal de Inmigración, con el fin de decidir si puede permanecer en los Estados Unidos.  En el caso de que Usted solicite esa audiencia, pudiera quedar detenido o tener derecho a la libertad bajo fianza hasta la fecha de la audiencia.Tiene la opción de solicitar el regreso a su país a la brevedad posible, sin que celebre la audiencia.

Usted tiene derecho a comunicarse con un abogado u otro representante legal para que lo represente en la audiencia, o para responder a cualquier pregunta acerca de sus derechos conforme a la ley en los Estados Unidos. Si Usted se lo pide, ese funcionario que le haya entregado esta Notificación le dará una lista de las asociaciones jurídicas que podrían representarlo gratuitamente o a poco costo. Tiene derecho a comunicarse con el servicio consular o diplomatico de su país. Puede usar el teléfono para llamar a un abogado, o a otro representante legal, o a un funcionario consular en cualquier momento anterior a su salida de los Estados Unidos.

### SOLICITUD DE RESOLUCIÓN

☐ Solicito una audiencia ante el Tribunal de Inmigración que resuelva si puedo o no permanecer en los Estados Unidos.
Iniciales

☐ Considero que estaría en peligro si regreso a mi país. Mi caso se trasladará al Tribunal de Inmigración para la celebración de una audiencia.
Iniciales

☒ Admito que estoy ilegalmente en los Estados Unidos, y no considera que estaría en peligro si regreso a mi país. Renuncio a mi derecho a una audiencia ante el Tribunal de Inmigración.  Deseo regresar a mi país en cuanto se pueda disponer mi salida. Entiendo que pudiera permanecer detenido hasta mi salida.
Iniciales  LF

Laura Flores
Firma del sujeto

6/9/09
Fecha

### CERTIFICATION OF SERVICE

☐ Notice read by subject
☒ Notice read to subject by  RAMIRO GARZA , in the  SPANISH  language.

RAMIRO GARZA
Name of Immigration Officer (Print)

Signature of Officer

Name of Interpreter (Print)

June 09, 2009 04:03 AM
Date and Time of Service

Form I-826 (08/01/07) N

7

[*Id.*]  Laura S. had been repatriated to Mexico before in 2002 and 2005, and allegedly signed nearly identical forms in 2002 and 2005, selecting the voluntary return option both times.[7]  [*See* Defs.' Ex. 3, Doc. No. 119–3 at 4; Defs.' Ex. 4, Doc. No. 119–4 at 4].

According to Plaintiffs, after being presented with Form I-826, Laura S.—weeping, visibly frightened, and anguished—told the agents that Sergio H. had long battered her and that she had a protective order against him.  The agents allegedly ignored Laura S.'s fears about returning to Mexico.  As claimed by Plaintiffs, Laura S. told the agents that Sergio H. would kill her if she returned to Mexico, but the agents ordered Laura S. and Cardiel to sign Form I-826 anyways.  Laura S. apparently twice refused to sign the form, and at one point, frustrated with her circumstances, described them as "an injustice."  Both Laura S. and Cardiel each eventually signed an I-826.

Agent Garcia was a supervisor the morning Laura S. was processed.  The extent of Agent Garcia's involvement with Laura S. is disputed.  Plaintiffs allege that he was personally involved in the violation of Laura S.'s constitutional rights.  According to Defendants, Agent Garcia had little to no involvement outside of a high-level supervisory level function, and it is questionable as to whether Agent Garcia even interacted with Laura S. on the day she was processed.

After Laura S., Cardiel, and Morales each chose the voluntary return option and signed Form I-826, Agent Garza drove them to the Hidalgo-Reynosa Bridge in Hidalgo, Texas to return the group to Mexico.  Laura S. allegedly continued to express her fear of the danger she believed awaited her in Mexico.  After crossing the bridge in the early morning, Laura S. went to her

---

[7] Laura S.'s actual signature does not appear on the I-826 forms she "signed" in 2002 and 2005 that are in the record.  [Defs.' Ex. 3, Doc. No. 119–3 at 4; Defs.' Ex. 4, Doc. No. 119–4 at 4].  According to the affidavit of Robert M. Duff, a division chief at CBP, CBP did not retain the signed versions of Laura S.'s documents and retrieved duplicate copies of the official record, attached as Defendants' Exhibit 3 & 4, from CBP's processing system.  [Doc. No. 119–3 at 6; Doc. No. 119–4 at 6].  The duplicate copies reflect the information that was electronically inputted at the time Laura S. was processed for voluntary return in 2002 and 2005.  [*Id.*]  The Plaintiffs do not contest the accuracy of either form.

grandmother's house in Reynosa, where she eventually reunited with Alvarez.  Alvarez claims that Laura S. was trying to raise enough money to return to the United States with the assistance of coyotes, or human traffickers.  Tragically, Sergio H. murdered Laura S. a few days later.

### III. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex Corp.*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255.  The key question on summary judgment is whether a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.  Since the question on a possible appeal is whether the Plaintiffs have presented evidence that creates an issue of material fact, this opinion concentrates sometimes to the point of repetition on the factual presentation.

## IV. Analysis

### A. Is There Evidence That Raises a Material Fact Issue as to Whether Agent Garcia Violated Laura S.'s Constitutional Rights?

Agent Garcia argues that he is entitled to summary judgment against Plaintiffs' claims because Plaintiffs have not shown that he personally violated Laura S.'s constitutional rights. The Court considers this separately from Agent Garcia's possible entitlement to the defensive shroud of qualified immunity. Obviously if there is no evidence of wrongful conduct, there would be no question that Agent Garcia is entitled to immunity. Agent Garcia claims that Plaintiffs have not produced any evidence suggesting any personal interaction with Laura S., much less any wrongful conduct, and are instead attempting to sue Agent Garcia on a legally impermissible theory of *respondeat superior* liability.

"[I]ndividual government officials cannot be held liable in a *Bivens* suit unless they themselves acted unconstitutionally." *Wood v. Moss*, 134 S. Ct. 2056, 2070 (2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009)) (internal quotation marks omitted). A plaintiff can not rely on *respondeat superior* liability when bringing a *Bivens* suit against an individual government official. *Iqbal*, 556 U.S. at 683. This concept was recently reaffirmed by the Supreme Court in *Ziglar*: "The purpose of *Bivens* is to deter the *officer* . . . *Bivens* is not designed to hold officers responsible for acts of their subordinates." 2017 WL 2621317, at *16 (internal citations omitted). A supervisory federal official may be held liable only upon two bases: (1) personal involvement in the acts causing the constitutional violation or (2) if the official implements a policy so deficient that the policy itself acts as a deprivation of constitutional rights.[8] *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998).

---

[8] There is no suggestion that Agent Garcia was the author of or in any way implemented a policy that deprived anyone of their constitutional rights.

Defendants argue that though Agent Garcia was a supervisor at the CBP processing center in Weslaco the morning Laura S. was processed, there is no evidence that he personally violated Laura S.'s constitutional rights.  In his capacity as a processing supervisor, Agent Garcia was responsible for working on employee schedules and performance ratings, monitoring the radio, and serving as a direct supervisor to Agent Garza, among others.  [Garcia Dep. 49:13–16, 57:16–18, 50:10–11, Apr. 20, 2016].  Agent Garza and other CBP agents would therefore direct any questions or problems they had in processing an individual to Agent Garcia on the morning Laura S. was processed.  [*See* Garcia Dep. 119:19–25; Garza Dep. 81:17–19, 93:3–9, 100:23–25, 101:1–3, Apr. 21, 2016].

It is undisputed that Agent Garcia signed off on Laura S.'s Record of Deportable/Inadmissible Alien form (Form I-213).[9]  [*See* Defs.' Ex. 2, Doc. No. 119–2 at 1]. Nevertheless, Agent Garcia swears that, though it was possible that he was at some time actually in Laura S.'s presence, he can not remember if he actually was or was not.  [Garcia Dep. 116:20, 121:1–3].  Agent Garcia's post was physically located in a separate room from the area where Laura S. was processed.  [*Id.* at 52:18–20, 65:5–8, 169:21–24].

The Plaintiffs do not provide any summary judgment evidence directly linking Agent Garcia to Laura S.'s processing aside from his signature on the I-213 form.  Instead, Plaintiffs point out that Cardiel and Morales observed other CBP agents in Laura S.'s presence apart from Agent Garza, and that if Laura S. were to have expressed a fear of returning to Mexico, and if the CBP agents had followed the normal routine, they would have involved Agent Garcia in his role

---

[9] "The Form I–213 is essentially a recorded recollection of a conversation with the alien . . . ."  *Bustos–Torres v. INS*, 898 F.2d 1053, 1056 (5th Cir. 1990).  Agent Garza completed the "narrative" portion of Form I-213 in which he described, among other things, how Laura S. was apprehended and why she was in the United States illegally. [*See* Defs.' Ex. 2, Doc. No. 119–2 at 2].

11

as a processing supervisor.  [Cardiel Dep. 47:25, 48:1, Apr. 13, 2016; Morales Dep. 27:13–17, Nov. 7, 2013; Garza Dep. 157:19-21].

The testimony of Agents Garcia and Garza provide that if a detainee indicated a fear of returning to Mexico, or made a commotion, that the processing supervisor would get involved. [Garza Dep. 189:22–25, 190:3–4; Garcia Dep. 83:15–23, 87:8–14, 88:3–6, 16–25].  The Plaintiffs argue that because Agent Garcia was the on-duty supervisor the morning Laura S. was detained and there is witness testimony to the effect that multiple officers interacted with Laura S., the standard practice of supervisory involvement in processing a detained alien who expresses a fear of returning leads to the conclusion that Agent Garcia personally violated Laura S.'s constitutional rights.  This is, at best, speculation.

The Plaintiffs have not provided any evidence suggesting that Agent Garcia actually, *personally* violated Laura S.'s constitutional rights or had any contact with her at all.  Even given the most charitable interpretation, they have identified Agent Garcia's presence as a supervisor who *should* have, under the facts as they interpret them, interacted with Laura S—but this is no proof Agent Garcia did.  Cardiel and Morales testified that there was more than one CBP agent in the processing center, yet could not identify any one of the other agents aside from Agent Garza.  [*See* Morales Dep. 30:1–16, 31:1–6; Cardiel Dep. 41:16–18].  Cardiel could not even identify Agent Garcia when shown his photograph.  [Cardiel Dep. 77:23–25, 78:1–22].  The Plaintiffs' sole focus is derived from Agent Garcia's potential involvement through his role as a supervisor.

The Plaintiffs have the burden of creating a contested fact issue for the eventual factfinder.  Here, Agent Garcia admits that it was "possible" that he was at some point in time in Laura S.'s presence.  [Garcia Dep. 121:1–3].  Nevertheless, the leap to establishing a

constitutional violation on Agent Garcia's part is far too tenuous.   There is no evidence that Agent Garcia was one of the agents who allegedly violated Laura S.'s constitutional rights.   The Court can not, without evidence, on a motion for summary judgment, assume Plaintiffs' preferred chain of events.

The Plaintiffs' evidence falls short of linking Agent Garcia to any constitutional violation of Laura S.'s rights.   At most, the Court is left with a two-step hypothetical: that (1) Agent Garcia should and would have been called into the processing area after Laura S. expressed a fear of returning to Mexico, and (2) once there, that Agent Garcia personally violated Laura S.'s constitutional rights.   The fact that he should have been brought into the processing area at some point, even if true, does not create the disputed issue of fact necessary to maintain a *Bivens* suit against Agent Garcia.   As there is no competent evidence before the Court that Agent Garcia had any involvement in any alleged violation of Laura S.'s rights, it is not necessary to discuss in detail if a triable issue of fact exists as to whether Agent Garcia acted in an objectively unreasonable manner for purposes of the qualified immunity analysis.   He is entitled to judgment both on the merits and on the issue of qualified immunity.   Agent Garcia's Motion for Summary Judgment is granted.

## B.  Is Agent Garza Entitled to Qualified Immunity?

As discussed earlier, the Court denied the Defendants' Motion to Dismiss for failure to state a claim in regard to Defendants' qualified immunity defense.   The Court ruled, as a matter of law, that Laura S. was entitled to Fifth Amendment due process protections in the deportation process.   [Memo Op. & Order, Doc. No. 81 at 22].   The Court also held, from the totality of the circumstances alleged in Plaintiffs' Complaint, that Agent Garza was not entitled to a Rule 12(b) dismissal due to the qualified immunity defense.   [*Id.* at 24].   Due to this ruling, the Court

allowed limited discovery to uncover only those facts the parties needed in order to address the immunity claim.  [Memo Op. & Order, Doc. No. 115 at 3].  With respect to Agent Garza, the sole issue presented regarding the applicability of the qualified immunity defense on summary judgment is whether a contested issue of fact exists as to whether Laura S. was coerced into choosing to return to Mexico.

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The concept of qualified immunity has broad application to officers acting in their official capacity.  The Supreme Court has summarized its reach by saying it applies to and protects "all but the plainly incompetent or those who knowingly violate the law."  *Ziglar*, 2017 WL 2621317, at *24 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1988)).  Determining whether a government official may be clothed in the defense of qualified immunity involves a two-step process in a 12(b) context.  "First, a court must decide whether a plaintiff's allegation[s], if true, establishes a violation of a clearly-established right."  *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004).  Second, "a court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident."  *E.A.F.F. v. Gonzalez*, 600 Fed. Appx. 205, 209 (5th Cir. 2015), *cert. denied,* 135 S. Ct. 2364 (2015).  A defendant's assertion of qualified immunity "alters the usual . . . burden of proof."  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting *Brown v. Callahan*, 623 F.3d 249, 253) (5th Cir. 2010)).  In the summary judgment context, the plaintiff thus bears the burden of proof to show a genuine and material factual dispute as to whether the official is entitled to qualified immunity.  *Id.*

"Immunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis deleted). Where there remain disputed issues of material fact related to immunity, the jury, if properly instructed, may decide the question. *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (quoting *Presley v. City of Benbrook*, 4 F.3d 405, 410 (5th Cir. 1993)) (internal quotation marks omitted). The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine to the extent that it turns on an issue of law. *Flores v. City of Palacios*, 381 F.3d 391, 393 (5th Cir. 2004) (quoting *Mitchell*, 472 U.S. at 530) (internal quotation marks omitted).

### 1.  Review of the Summary Judgment Evidence and Legal Objections

As stated earlier, this Court has already held that Laura S. had clearly established rights governed by the United States Constitution. Though the Court previously ruled Laura S. was entitled to Fifth Amendment protections which would include an immigration hearing if requested, [Memo Op. & Order, Doc. No 81 at 9], "due process rights, including the right to a hearing, can be waived." *See United States v. Cordova-Soto*, 804 F.3d 714, 720 (5th Cir. 2015). While due process rights may be waived, any waiver must be done knowingly and voluntarily. *McCarthy v. Mukaskey*, 555 F.3d 459, 462 (5th Cir. 2009). In analyzing whether a waiver was made knowingly and voluntarily, courts "must indulge in every *reasonable* presumption against a waiver." *Nose v. Attorney Gen. of U.S.*, 993 F.2d 75, 79 (5th Cir. 1993) (emphasis added). The constitutional sufficiency of the procedures required by due process differs with the circumstances of each individual case. *United States v. Benitez-Villafuerte*, 186 F.3d 651, 656

(5th Cir. 1999). The "full range of constitutional protections available to a defendant in a criminal case are not afforded an alien in a deportation proceeding." *Id.* at 657.

For purposes of this Motion, the key issue is whether Laura S. was coerced into choosing the voluntary return option. Agent Garza argues that he is entitled to qualified immunity because there is no competent summary judgment evidence that Laura S. was coerced into opting for a voluntary return to Mexico. The Court will first summarize the summary judgment evidence provided by both parties and resolve the evidentiary objections raised. Next, though this necessarily entails some repetition, the Court will next determine whether an issue of fact exists as to whether Laura S. knowingly signed Form I-826 and finally it will decide if a fact issue exists as to whether Laura S. voluntarily signed the form. Obviously, due to the death of Laura S., the primary witnesses are the two defendants, and Alvarez, Cardiel, and Morales. All have been deposed, and their depositions are part of the summary judgment record.

i.   Alvarez

Elizabeth Alvarez, Laura S.'s cousin, had known Laura S. for her entire life. [Alvarez Dep. 9:1–5, Oct. 23, 2015]. When asked to describe her relationship with Laura S., Alvarez responded that they were best friends. [*Id.* at 9:14–16]. Alvarez was aware of Laura S.'s violent history with Sergio H. and of the protective order Laura S. obtained against Sergio H. [*See id.* at 11:1–25, 12:11–25]. Alvarez was with Laura S., Morales, and Cardiel when they were first apprehended by the police officer. [*Id.* at 15:15–21]. When the police officer informed the group that he was going to call an immigration officer, Alvarez stated that Laura S. told him not to do so because she was scared of being killed in Mexico. [*Id.* at 16:6–18]. Laura S. told the police officer that Sergio H. was working for Mexican cartels and that he would be able to follow

through on his threat to kill her if she returned. [*Id.*] Laura S. asked the police officer to wait so she could prove that she had a protective order against Sergio H. [*Id.* at 16:19–24].

When Agent Garza arrived, according to Alvarez, Laura S. began to cry, tremble, and shake. [*Id.* at 17:15–17]. Laura S. told Agent Garza that Sergio H. had threatened her life, that she did not want to be deported, and asked for additional time to get a copy of her protective order. [*Id.* at 17:14–22]. Alvarez testified that Laura S. informed Agent Garza that her youngest child needed to undergo a medical operation and that Laura S. had to be in the United States for the procedure. [*Id.* at 18:7–10, 22:11–12]. As Laura S. spoke Spanish, Alvarez translated the message to Agent Garza in English to make sure he understood Laura S.[10]   [*Id.* at 5:22–25]. According to Alvarez, in response to Laura S.'s pleas, Agent Garza just laughed. [*Id.* at 17:22–25]. Alvarez had a laser visa, but the rest of the group was undocumented, and Alvarez watched as Agent Garza loaded Laura S., Cardiel, and Morales into his vehicle. [*See id.* at 18:14–16]. Alvarez testified that Laura S. was crying the entire time. [*Id.*] Alvarez stayed behind, waiting for her aunt and mother to pick her up as Agent Garza took Laura S., Cardiel, and Morales to the CBP processing center. [*Id.* at 18:21–23].

Alvarez reunited with her cousin the next morning, after Laura S. had been repatriated back to Mexico, at their grandmother's house in Reynosa. [*Id.* at 19:10–12]. Alvarez testified that in front of their grandmother and other people,[11] Laura S. acted "normally." [*Id.* at 19:15–17]. Once Alvarez and Laura S. were alone, however, Laura S. acted scared, was shaking and smoking cigarettes, and seemed desperate. [*Id.* at 19:15–19, 21:1–4]. The "first thing" that

---

[10] Agent Garza is fluent in Spanish. [Garza Dep. 9:14–16]. Alvarez testified that she translated for Laura S. so that there would be "no doubt" that Agent Garza understood what Laura S. was saying. [Alvarez Dep. 5:22–25].
[11] It is unclear from the deposition testimony who these other people were. The deposition transcript reflects that Alvarez testified that she met Laura S. in front of her grandmother and an "agent" at the house in Reynosa, but later clarified upon being questioned by counsel that she had not said "agent," but instead had said in Spanish "gente," or "people." [Alvarez Dep. 19:15, 20:7–14].

Laura S. said to Alvarez when they were alone was that "[t]hose assholes threw me out."[12]   [*Id.* at 19:20–22].   Alvarez testified that Laura S. was seeking to cross the border again to get out of the reach of Sergio H. but would need the help of "coyotes," or border smugglers.   [*Id.* at 21]. Before Laura S. was killed, she was trying to save enough money to get back over the border, an amount Alvarez testified could cost around $1,500.   [*Id.*]

Agent Garza objects to this portion of Alvarez's testimony on hearsay grounds.   Alvarez, though initially apprehended with Laura S., was not processed with Laura S.   Instead, Alvarez visited Laura S. at their grandmother's house after she returned to Mexico.   The testimony Agent Garza singles out is Alvarez's recounting of her conversation with Laura S. about the events at the CBP processing center in Weslaco when the pair reunited at their grandmother's house in Reynosa.

At first, in front of Alvarez, their grandmother and other unidentified people, Laura S. acted "normally."   [*Id.* at 19:15–17].   Once, alone with Alvarez, Laura S. began to shake, and was scared and desperate.[13]   [*Id.* at 19:15–19, 21:1–4].   Alvarez then testified that she heard Laura S. exclaim: "[t]hose assholes threw me out!"   [*Id.* at 19:20–22].   The Defendants argue that the latter portion of this statement is offered for the truth of the matter asserted (that Laura S. was thrown out against her will), and that the statement does not fall into any applicable hearsay exception.   The proponent of hearsay evidence bears the burden of proving the applicability of an exception.   *United States v. Fernandez-Roque*, 703 F.2d 808, 812 (5th Cir. 1983).

Plaintiffs contend that Laura S.'s statement qualifies as a present sense impression.   [Pls.' Resp., Doc. No. 123 at 28].   The present sense impression exception to hearsay provides that a

---

[12] As Laura S. was not an English speaker, Alvarez translated Laura S.'s original remarks in her deposition testimony.   The word Laura S. originally used to describe the agents who processed her at the CBP center in Weslaco was "pendejos."   [Alvarez Dep. 19:21–22].

[13] Alvarez claims that she had insight into Laura S.'s emotional state because of the way Laura S. was smoking cigarettes.   [Alvarez Dep. 21:1–2].

"statement describing or explaining an event or condition, made while or *immediately* after the declarant perceived it" is exempt from the hearsay rule.  Fed. R. Evid. 803(1) (emphasis added).  The justification for this hearsay exception relies on the contemporaneousness of the event under consideration and the statement describing that event.  *Rock v. Huffco Gas & Oil Co.*, *Inc.*, 922 F.2d 272, 280 (5th Cir. 1991).  Since the event and the statement occur almost simultaneously, there is almost no "likelihood of [a] deliberate or conscious misrepresentation."  *Id.* (citations omitted).

The Defendants argue that Laura S.'s statement references the alleged coercive act at issue—the signing of the I-826 form.  The Defendants use that point to calculate the time between when Laura S. signed the I-826 form and Laura S.'s statement to Alvarez in Reynosa as being, in the light most favorable to the Plaintiffs, approximately 3.5 hours.  [*See* Defs.' Reply, Doc. No. 129 at 18–23].  The Plaintiffs agree that the statements refer to the events at the CBP processing center in Weslaco, [Pls.' Resp., Doc. No. 24 at 28], but argue that the timer should start at the actual time Laura S. was walked back into Mexico rather than the time she was allegedly coerced to sign.  [Pls.' Surreply, Doc. No. 137 at 9].

The core dispute between Plaintiffs and Defendants is when the Court should start the clock.  Technically, the point when Laura S. waived (allegedly) her right to stay in the United States for additional processing was the point when she completed the I-826 form.  If, as Plaintiffs argue, Laura S.'s reference to being "kicked out" also attached to the time when Laura S. crossed the border, there is nothing to suggest that Plaintiffs could not extend the relevant "event or condition" to any point until Laura S.'s murder.  While the Court does not perceive this dispute as critical to the overall resolution of the issue presented in this case, in order to resolve it, the Court must draw the line somewhere.  The Plaintiffs could just as easily argue that an

identical statement made by Laura S. to Alvarez should fall under the exception if the pair happened to meet a week or two later, when Laura S. was trying to raise money for her return to the United States.

The Plaintiffs seek to use Laura S.'s outburst to establish that the events in the CBP processing center, to which Alvarez was not privy to, included coercion on part of Agent Garza. The Plaintiffs provide the Court with no exact timeline to calculate the time passed between the signing of the waiver form and Laura S.'s statement in Reynosa. Nevertheless, even if the Court were to give Defendants' calculation of the timeline a significant haircut, Laura S.'s statement to Alvarez would not qualify as one made "while or immediately" after Laura S. perceived the event in question. *See United States v Cain*, 587 F.2d 678, 681 (holding that a statement made 15 minutes after the perceived event did not satisfy Rule 803(1)).

The Plaintiffs also argue that Laura S.'s hearsay statement passes muster under the excited utterance exception. [Pls.' Resp., Doc. No. 123 at 28]. Rule 803(2) provides that a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is admissible as an exception to hearsay. Fed. R. Evid. 803(2). Unlike the present sense impression exception, the excited utterance exception is not determined solely based on the period of time that elapsed between a statement and the event it references. *United States v. Hefferon*, 314 F.3d 211, 223 (5th Cir. 2002). Instead, under Rule 803(2), the key factor is "spontaneity." Fed. R. Evid. 803(2) Advisory Committee's Note. The statement in question must be spontaneous, excited, or impulsive rather than the product of reflection and deliberation. *United States v. Lawrence*, 699 F.2d 697, 704 (5th Cir. 1983).

Whether a statement qualifies as an excited utterance is a case-by-case determination, but the core focus for the court is the existence of a startling event or condition that provokes the

20

utterance.  *See Hefferon*, 314 F.3d at 222 (reviewing treatment of factors such as age, possibility of fabrication, and coaching as relevant to whether a statement qualifies as an excited utterance). Where the court is satisfied that the event in question was such as to cause adequate excitement, the inquiry is ended.  2 K. Broun, McCormick on Evidence § 272 (7th ed. 2013).

Though a sufficient cooling period may preclude a statement from the exited utterance exception, courts have found statements to fall under the exception even when made as far as weeks after the "startling" event in question.  *See, e.g.*, *United States v. Napier*, 518 F.2d 316, 317 (9th Cir. 1975) (finding that a statement made by a victim of an assault after looking at a photograph of the assailant nearly eight weeks after the assault was properly admitted under the excited utterance exception because the victim was sufficiently excited by the photograph).  As with the present sense impression exception, the proponent of the hearsay evidence bears the burden of proving the excited utterance exception.  *See Fernandez-Roque*, 703 F.2d at 812.

The Defendants argue that Laura S.'s statement to Alvarez was (1) not spontaneous, and (2) was not made while Laura S. was upset about the events at the processing center at Weslaco. [Defs.' Reply, Doc. No. 129 at 33].  In support, Defendants focus on this exchange:

> Counsel: And so I think it makes it pretty clear how she felt, but when she said that to you, "[t]hey threw me out," how did - - how was she feeling about being back in Reynosa?
>
> Opposing Counsel: Object to the question.  Speculation.
>
> Alvarez: Obviously she felt scared that (Sergio H.) would look for her, find her, and go through with the death threat that he had already made.

[Alvarez Dep. 19:23–25, 20:1–6].  The Defendants argue that Alvarez did not indicate that Laura S.'s fears were inspired by the events in the CBP processing center, but rather Alvarez testified that Laura S.'s fears were motivated by Sergio H.  The Plaintiffs respond that first, Defendants ignore the "integrated situation as a whole"—and insist that this Court's analysis should

encompass the events at the CBP processing center in Weslaco and the return to Mexico. [Pls.' Surreply, Doc. No. 137 at 8]. The Plaintiffs add that, "in any case," regardless of the precise time of day the two cousins met or how the "event at issue is defined," Laura S. was under the stress of excitement caused by the events her statement described. [*Id.*]

Whether the Court considers the "integrated situation as a whole" or per Alvarez's deposition testimony looks solely to Laura S.'s excited state at her grandmother's house—Laura S.'s utterance does not fall under the excited utterance exception. An excited utterance must be "impulsive" rather than the product of "reflection or deliberation." *Lawrence*, 699 F.2d at 704. Regardless of whose timeline one believes, the reunion at Laura S.'s grandmother's house was too attenuated for Laura S. to remain in an excited state.

More importantly, Alvarez's testimony, itself, proves that Laura S.'s outburst was not an excited utterance. She avers that while Laura S. was in front of their grandmother, she acted quite "normally." She clearly had the ability to control her emotions and "excitement." Only when they were alone did she express her outrage. This is not an excited utterance. Though the dispositive question before the Court is not the lapse of time between the startling event and the statement, the combination of the cooling off period and Laura S.'s complete composure while in the presence of her grandmother and others establishes that Laura S.'s statement to Alvarez was the product of deliberation and reflection, undercutting the reliability that a "spontaneous" statement would offer per Rule 803(2).

The Plaintiffs, as proponents of the admission of hearsay evidence, have not met their burden to show that Laura S.'s statement to Alvarez related to the startling event or condition Plaintiffs seek to use the statement to prove—that Laura S. was coerced inside the CBP processing center. The Court agrees with Defendants that Laura S.'s statement to Alvarez as

quoted above is inadmissible hearsay.[14]   Due to the lack of probative value which one may glean

from this statement, this evidentiary ruling, however, is not critical to the issue currently before

the Court.

ii.    Cardiel

Cardiel was with Laura S. from when she, Laura S., Alvarez, and Morales were first

apprehended by the police officer near Pharr, Texas.   Cardiel was a co-worker and was aware of

Sergio H.'s violent history and that Laura S. had a protective order against him.   [*Id.* at 22:16–20,

23:15–20].   Cardiel, who was also in the United States illegally, claims that after the police

officer called for an immigration officer, Laura S. told the officer that he should not have called.

[*Id.* at 30:20–21].   Cardiel testified that Laura S. told the police officer that she had a protective

order and that she did not want to go back to Mexico, but Cardiel could not recall whether Laura

S. identified Sergio H. as the source of her apprehension.   [*Id.* at 31:9–12, 32:6–7].

After Agent Garza arrived, Cardiel testified that Laura S. told Agent Garza over and over

again that she did not want to go Mexico because Sergio H. would kill her.   [*Id.* at 34:3–10].

While being transported in the CBP vehicle with Laura S. on the way to the CBP processing

center, Cardiel stated that Laura S. was crying and weeping and that Laura S. told Agent Garza

about her fear of returning to Mexico because of Sergio H.   [*Id.* at 36:8–16, 37:4–10].   Once at

the CBP processing center in Weslaco, Cardiel testified that she overheard Agent Garza say to an

---

[14] The Court questions, but does not rule, whether the statement would also be inadmissible under Fed. R. Evid. 403. The probative value is quite minimal (if there is any at all) while the prejudicial effect could be substantial.   This statement is the equivalent of an individual sometime after the event complaining that a highway patrolman gave her or him a ticket for speeding.   A person might use the same pejorative term to describe the officer, and the fact that one complains about the result is not proof that the ticket was not warranted, nor is it proof that the officer in question was unprofessional.   Obviously, the consequences in a deportation scenario are much more serious than in a traffic infraction.   Nevertheless, in the instant case, Laura S. was clearly demonstrating her displeasure at being deported, but it is clearly not the case that she was literally "thrown out" of the United States as she left this country by walking across the bridge.   The Court does not pre-emptively rule it inadmissible on this ground because Rule 403 contemplates a balancing test, the result of which might change as trial progresses.

23

unidentified agent that he was in a rush and that he had to leave.[15]   [*Id.* at 43:7–10].   Cardiel averred that Agent Garza and another agent presented the I-826 forms to both Cardiel and Laura S.  [*See id.* at 43:14–16].   According to Cardiel, the agents indicated to Laura S. and Cardiel "in a strong" and "ordering" manner that Laura S. and Cardiel "had to go to Mexico."  [*Id.* at 43:14–19].

Cardiel testified that Agent Garza and the unknown agent did not yell, but that they used a "high volume voice."  [*Id.* at 43:20–22].   Agent Garza and the unknown agent told Cardiel and Laura S. that the agents needed to leave and that they needed to drop off Cardiel and Laura S. at the bridge to Mexico.  [*Id.* at 45:1–4].   Laura S. told the agents about her protective order and about her fears of going back to Mexico.  [*Id.* at 45:3–20].   According to Cardiel, Agent Garza "mock[ed]" her and Laura S. and told the pair that they "ha[d] to sign."  [*Id.* at 45:2–5].   Cardiel testified that the agents looked annoyed.  [*Id.* at 43:14–16, 44:22–25].

According to Cardiel, Laura S. refused to sign twice and stated: "this is an injustice."  [*Id.* at 45:23–24, 69:16–19.].   Cardiel testified that Agent Garza and the other agent pointed firmly to the signature lines on the I-826 forms and ordered the pair to sign.  [*Id.* at 69:9–14].   Cardiel claimed that both she and Laura S. refused to sign the I-826 forms.  [*Id.* at 44:25, 45:1–2].   Cardiel averred that Laura S.'s intelligence was "very good" and that Laura S. never indicated to Cardiel that she had any mental disorder.  [*Id.* at 24:17–25].

Cardiel gave a number of contradictory reasons why she, herself, eventually signed Form I-826.  One explanation was that she signed the form because Agent Garza and the unidentified agent were armed and that she could tell they "wanted to throw [Laura S. and Cardiel] back."  [*Id.* at 46:2–5].   Nevertheless, according to Cardiel, the agents had their handguns holstered.  [*Id.*

---

[15] Cardiel did not testify as to whether Laura S. could have overheard Agent Garza's comment to the unidentified agent about being rushed.

at 46:6–8].  Cardiel was unrestrained, was not handcuffed, and was not physically forced to sign the I-826 form.  [*Id.* at 44:1–12].  The agents did not threaten Cardiel or her family.  [*Id.* at 44:13–16].  Cardiel testified that she did not think the agents would hurt her if she refused to sign but was instead worried that the agents would "lock [her] in for a long period of time."  [*Id.* at 71:1–8].  When asked whether she felt threatened if she did not sign the form, Cardiel answered "[y]es," [*Id.* at 72:22–24].

Asked to clarify the manner in which she felt threatened, Cardiel testified that she felt threatened because she did not want to be locked up on account of her children.[16]  [*Id.* at 72:5, 73:1–2] ("I didn't want to be locked in because I [had] children.").  When asked whether she signed Form I-826 because it was the fastest way to be released from custody, Cardiel again answered, "[y]es."  [*Id.* at 73:3–5].  Cardiel also averred that she and Laura S. signed because they "had no choice," since the agents "didn't tell [them] that [they] could see a judge or anything."[17]  [*Id.* at 70:14–22].  Cardiel had prior experience with voluntary return but averred that she was not made aware of her option to see an immigration judge in 2009.  [*Id.* at 72:13–20].  She testified that, in her prior experience with voluntary return, she was told that she could go see an immigration judge.  [*Id.* at 71:16–23].  Cardiel testified that she recalled Laura S. at one point saying that she did not want to sign because she did not want to go back to Mexico.  [*Id.* at 46:13–16].

After the pair signed the I-826 forms, Agent Garza took Cardiel, Morales, and Laura S. to the Hidalgo-Reynosa Bridge to cross over to Mexico.  [*Id.* at 48:5–12].  On the way to the

---

[16] At the time of her deposition, Cardiel had lived illegally in Pharr, Texas for 13 years.  [Cardiel Dep. 13:3–17].  Cardiel testified that she lived with her husband, and had five children.  [*Id.*]  Prior to living in Pharr, she lived in Ciudad Victoria, Mexico.  [*Id.* at 18–21].  At the time of the events underlying this suit transpired, Laura S. had three young children living in the United States.  [*See* Alvarez Dep. 10:9–18].

[17] Though Cardiel was speculating on Laura S.'s mental state, the Defendants did not object to Cardiel's statement.  The Court may only consider admissible evidence for purposes of Defendants' Motion.  *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995).  Nevertheless, the Court can certainly consider the statement for Cardiel's mental state.

bridge, Cardiel claims that Laura S. told Agent Garza: "If I am killed, you will carry that in your conscience." [*Id.* at 49:6–8]. Cardiel testified that between 20 or 30 minutes passed from the point when officers showed Cardiel the I-826 form and when Cardiel signed the form, though Cardiel estimated that the entire process took about three to four hours. [*Id.* at 47:4–15].

In Mexico, Cardiel accompanied Laura S. to Laura S.'s grandmother's house, but then left Laura S. to go to her relative's house. [*Id.* at 51:2–9]. She met up with Laura S. later that day at a bus station, where Laura S. asked Cardiel if there was someone who could take Laura S. back to the United States because Sergio H. had been looking for her. [*Id.* at 51:8–22]. Cardiel would never see Laura S. again. At some point after her meeting with Laura S., Cardiel swam back to the United States through the Rio Grande river and returned to her house in Pharr.[18] [*Id.* at 52:14–23]. There, Cardiel received a call from a common friend that Laura S. had been killed. [*Id.* at 54:10–14]. Cardiel paid to swim the river, but could not recall how much she paid. [*Id.* at 52:24–25, 53:1–6]. When asked whether Laura S. could swim, Cardiel could not recall whether Laura S. could or could not. [*Id.* at 53:13–14].

Defendants object to the part of Cardiel's testimony where she was questioned as to the exact reason why she thought Laura S. signed Form I-826. [Defs.' Mot. for Summ. J., Doc. No. 118 at 34]. When Cardiel was asked whether or not she knew why Laura S. signed the I-826 form after refusing to do so two times, she answered "no." [Cardiel Dep. 46:24–25, 47:1–3]. From this exchange, Defendants argue that Cardiel had no personal knowledge as to why Laura S. signed the form.

The Plaintiffs concede that Cardiel can not testify to the exact reason why Laura S. ultimately signed Form I-826. [Pls.' Resp., Doc. No. 123 at 27]. Nevertheless, Plaintiffs argue

---

[18] Cardiel did not identify exactly which day she swam back to the United States. Cardiel was, however, back in her house in Pharr, Texas before Laura S.'s death. [Cardiel Dep. 53:17–24].

that Cardiel's value as a witness to show coercion on the part of Agent Garza does not rest on her ability to read Laura S.'s mind.  Cardiel was processed simultaneously with Laura S. and can, for the most part, testify to exchanges between Laura S. and the agents and verbal and physical expressions of Laura S.'s mindset.  Clearly, Cardiel has sufficient personal knowledge to testify about any events she witnessed at the CBP processing center and to the actions of Agent Garza (or any other agent) that she and Laura S. experienced jointly.  The Defendants' objection is overruled as to those events Cardiel personally witnessed.

   iii.   Morales

Morales was apprehended by the police officer along with Laura S., Cardiel, and Alvarez. Before the police officer called Agent Garza, Morales testified that Laura S. was the only one that looked stressed and that Laura S. told the police officer not to call immigration because of the danger Sergio H. posed in Mexico.  [Morales Dep. 19:12–24].  Like Cardiel and Alvarez, Morales testified that Laura S. told Agent Garza that she feared being sent back to Mexico on account of Sergio H. and that she had a protective order against him.  [*Id.* at 23:2–15]. According to Morales, Laura S. asked Agent Garza to let her go.  [*Id.* at 22:17–19].

In the Weslaco processing center, Morales, though relatively far from Laura S., claimed that he could still hear what Laura S. was saying and could see her in plain sight.  [*Id.* at 24:18– 25, 25:1].  He testified that while she was being processed, Laura S. sounded frightened, cried, and looked like she was in anguish.  [*Id.* at 28:3–12].  Morales testified that Laura S. was begging not to be deported and that she told Agent Garza and the unidentified CBP agent that she feared being killed.  [*Id.* at 28:15–16].  Morales testified that an "anguished" Laura S. continued to beg for release all the way to the bridge.  [*See id.* at 31:18–25, 32:1–3, 33:1–2].

The Defendants argue that because Morales did not recall Laura S. signing any form, the Court should discount Morales' testimony about the events at the CBP processing center. [Defs.' Mot. for Summ. J., Doc. No. 118 at 33]. The fact that Morales, himself, did not remember Laura S. signing any documents does not serve to discount the entirety of his testimony—especially when the Court is weighing solely the issue of whether a fact question exists.

iv.   The Agents' Testimony

Agent Garza's account of the events at the CBP processing unsurprisingly differs greatly from that of Cardiel, Alvarez, and Morales. Agent Garza testified that though he does not remember "exactly" how the group reacted when he picked them up, he did not think that they were too happy or too upset—more complacent. [Garza Dep. 86:6–9]. He does not recall Laura S. begging him not to send her back to Mexico, crying in the car, mentioning the protective order, or assigning him moral responsibility for her possible death. [Id. at 86:6–25, 87:1–5, 96:8–11]. According to Agent Garza, had Laura S. told him that she feared going back to Mexico, she would have seen an immigration judge.[19] [See id. at 189:22–25, 190:3–4]. Agent Garza indicates that he had ample time to process Laura S. as he was assigned a shift from midnight to 8:00 AM and had two additional hours of "administratively uncontrollable overtime," pushing his total shift until 10:00 AM. [Id. at 70:15–21, 104:18–105:10].

Agent Garcia, the supervisor on duty at the CBP center in Weslaco the morning Laura S. was processed, repeatedly corroborates Agent Garza's testimony. According to Agent Garcia, an alien subject to voluntary return who expressed a fear of return would have their I-826 form

---

[19] The Defendants point out that Laura S. had no "right" to a "credible fear" interview under the expedited removal statute through 8 U.S.C. § 1225 [See Defs.' Reply, Doc. No. 129 at 17, 20–21]. "Credible fear" is a term of art used in the context of expedited removal under 8 U.S.C. § 1225. See 8 C.F.R. § 235.3(b)(4). Laura S. was not eligible for expedited removal as expedited removal is limited to illegal aliens who have been in the United States for no more than 14 days immediately prior to the date of their encounter with immigration officials. See 69 Fed. Reg. 48877-01 (Aug. 11, 2004). The Plaintiffs do not contend that Laura S. fits this category. Nevertheless, Agents Garza and Garcia both testified about the "trigger" that would lead to an eventual hearing before an immigration judge.

marked as such and would be issued a notice to appear to see an immigration judge.  [Garcia

Dep. 83:15–23, 87: 8–14, 88:3–6, 16–25].

**2.  Did Laura S. Knowingly Select Removal on Form I-826?**

When considering whether Laura S. knowingly waived her right to a deportation hearing

the Court must consider: (1) the clarity of the written waiver agreement, (2) whether the party

was represented by or consulted with an attorney, and (3) the party's background and experience.

*Nose*, 993 F.2d at 79.  Courts "must indulge in every reasonable presumption against a waiver."

*Id.*

i.      Clarity of Form I-826

Form I-826, clear and unambiguous by design, is a "relatively simple document."  *See*

*O'Hare v. Glob. Nat. Res., Inc.*, 898 F.2d 1015, 1016–17 (5th Cir. 1990) (upholding a claims

release where an employee had the experience and training to understand the "plain and

unambiguous" release document).  Laura S. was a native Spanish speaker.  The I-826 form Laura

S. was presented with was written in Spanish and clearly set out Laura S.'s rights and options.

[*See* Defs.' Ex. 2, Doc. No. 119–2 at 4–5].  A section entitled "Notice of Rights" listed the rights

and options provided to Laura S.  [*Id.*]  It stated that Laura S. had the right to appear before an

immigration judge to determine if she could stay in the United States.  [*Id.*]  Form I-826 gave

Laura S. the right to contact an attorney or other legal representative regarding her rights in the

United States.  [*Id.*]  The form also stated that the agency could provide a list of legal

organizations upon request.  [*Id.*]  The form gave Laura S. the right to communicate with a

consular, diplomatic officer, lawyer, or legal representative at any time.  [*Id.*]  This factor clearly

favors the Defendants' position.

ii.     Whether Laura S. Was Represented by or Consulted with an Attorney

Laura S. was not represented by an attorney.  Although the I-826 form indicated that Laura S. would be provided a list of legal organizations upon request, there is no evidence that Laura S. asked to contact an attorney.  Since Laura S. was processed before dawn, there is little chance an attorney would have been immediately available to her had she requested one at the time.  Of course, had she requested one, she would have been held in custody, at least until one arrived.  There is no evidence that Laura S. requested an attorney or that any party prevented Laura S. from obtaining an attorney.  This factor does not favor either side.  Clearly, given the fact that this encounter occurred after 2:00 in the morning, an attorney was not immediately available.  Nevertheless, it is equally clear that Laura S. did not request one.

iii.    Laura S.'s Background and Experience

The morning in question was not the first time that Laura S. had seen Form I-826.  Laura S. was presented with Form I-826 in both 2002 and 2005, resulting in her repatriation to Mexico both times.  [*See* Defs.' Ex. 3, Doc. No. 119–3; Defs.' Ex. 4, Doc. No. 119–4].  She chose the voluntary return option both times.  [*Id.*]  Cardiel testified that Laura S.'s intelligence was "very good," and Cardiel's testimony indicates that Laura S. knew that signing Form I-826 would lead to her removal to Mexico, [*See* Cardiel Dep. 46:10–12], a detail that Plaintiffs readily admit. [Pls.' Resp., Doc. No. 123 at 29].  There is no evidence that Laura S. could not read or understand Form I-826, a form nearly identical to the ones she was presented with in 2002 and 2005.  Furthermore, the evidence is undisputed that she had ample time to read and consider it, and that she knew the effect of the box she checked.  This factor clearly favors the Defendants.

30

iv.     Totality of the Circumstances

The Plaintiffs argue that even if Laura S. had signed a voluntary return form before, circumstances were different for Laura S. in 2009.  Sergio H. allegedly told her that he would kill her if she returned to Mexico after her experience with voluntary return in 2002 and 2005.  Thus, Plaintiffs contend that Laura S. had no experience with voicing her fears of returning, and accordingly, can not be said to have signed the waiver knowingly.  One could likewise speculate and reach the opposite result if one assumed that Laura S., like Cardiel, wanted the quickest route to be reunited with her children.  The undisputed facts do not support Plaintiffs' speculation.  Laura S. would not have needed to know the effect of voicing her fears beforehand—Form I-826 plainly elucidates her right to see an immigration judge should Laura S. have believed that harm awaited her in Mexico.

The Plaintiffs also argue that Laura S. would need to understand that Defendants were incorrect in telling her, as Cardiel testified, that she must be removed to Mexico.  [Cardiel Dep. 43:14–16] (Agent Garza and another agent told Cardiel and Laura S. that they "had to go to Mexico.").  The Plaintiffs point out that unlike the parties in *Nose*, where the plaintiff, a highly educated individual who consulted with counsel was found to have voluntarily waived her rights to an immigration hearing, Laura S. would have needed to actually understand that Defendants were incorrect in telling her that she must be removed to Mexico.

The entirety of Laura S.'s options were laid out clearly in Form I-826, a document she could understand and one with which she was familiar.  Testimony that Agent Garza and another agent told Laura S. and Cardiel that they "had to go to Mexico" does not rise to the level of misrepresentation that would indicate that the waiver was made unknowingly.  Certainly, given the option she chose on Form I-826, she knew she would have to go to Mexico.  For example, if

Agent Garza had told Laura S. that by signing Form I-826 she could gain citizenship, the Court could conclude that Agent Garza misrepresented the options available to Laura S. on the form. *See Ibarra-Flores*, 439 F.3d at 620 (finding that an alien did not knowingly or voluntarily accept voluntary departure where the immigration officials told the alien that he could apply for residence, but only if he signed a document waiving his right to request any type of immigration relief).

There is no evidence that Agent Garza or any other agent affirmatively misrepresented Laura S.'s rights so as to muddle the rights spelled out on Form I-826. *See Gutierrez v. Mukasey*, 521 F.3d 1114, 1117 (9th Cir. 2008) (finding that an alien knowingly signed Form I-826 as he alleged no misrepresentations by immigration officials nor any other circumstances suggesting an absence of consent); *Reyes-Rojas v. Lynch*, 644 Fed. Appx. 725, 725–26 (9th Cir. 2016) (where there was no evidence of misrepresentation by immigration officers, substantial evidence supported the Board of Immigration Appeals' decision that the alien knowingly and voluntarily accepted voluntary departure).

Laura S. was of able mind and could read the options plainly listed on Form I-826 (options she was faced with in 2002 and 2005). There is nothing to suggest that Laura S. misunderstood the clear, one-page form provided to her. Cardiel testified that, unlike in her prior experience with voluntary return, she was not told she could see an immigration judge in 2009. [Cardiel Dep. 72:6–15]. The Plaintiffs argue that the alleged difference in disclosure shows that Cardiel was confused about her options when she signed Form I-826 in 2009—the inference being that Laura S. could have similarly been confused. Cardiel, however, provides no relevant testimony to suggest that she could not understand the options presented to her on Form I-826

the morning she was processed with Laura S.  Furthermore, to impute Cardiel's state of mind to Laura S. is pure speculation.

"[T]here can be little question" that had Cardiel and Laura S. "read [Form I-826], they would have understood [their] options and understood that they carried lasting legal consequence." *Reyes-Sanchez v. Holder*, 646 F.3d 493, 499 (7th Cir. 2011).  Plaintiffs do not argue that Laura S. did not read the form.  There is no evidence that supports this.  Moreover, it is clear from Cardiel's testimony that Laura S. understood the consequences of the option she chose even though she was not represented by counsel.  Plaintiffs concede as much.  *See Silva-Blanco v. Holder*, 568 Fed. Appx. 293, 294 (5th Cir. 2014) (even though an alien subject to removal submitted an affidavit asserting that she did not know what she was doing when she signed Form I-826, the "affidavit [was] not so compelling that no reasonable fact-finder could conclude that she accepted voluntary departure.") (internal quotation marks omitted).  Furthermore, all of the evidence supports the conclusion that Laura S. understood the effect of her choice regarding Form I-826, even if she was upset about what would be the eventual result.

The Court finds that the totality of the circumstances indicates that Laura S. understood the options available to her on the one-page Form I-826—a form nearly identical to the one she had seen in both 2002 and 2005.  Thus, even when accounting for a presumption against any waiver, the Court finds that the Plaintiffs have not raised a genuine question for the factfinder as to whether Laura S. knowingly signed Form I-826.

### 3.  Did Laura S. Voluntarily Select Removal on Form I-826?

The much closer question is whether a fact issue exists as to whether Laura S. executed Form I-826 voluntarily.  Obviously, one can knowingly execute a document and still do so under the influence of coercion.  The Fifth Circuit has applied a totality of the circumstances approach

in evaluating the voluntariness of a waiver in the non-criminal context.[20]  *See Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 292 (5th Cir. 2013) (addressing a waiver in the context of the Employee Retirement Income Security Act).

Potential factors include: (1) the existence of threats or violence, (2) the exertion of improper influence, (3) length of detention, (4) location of detention, and (5) the detainee's maturity, education, and physical and mental condition.[21]  *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987); *see Sosa v. Dretke*, 133 Fed. Appx. 114, 119 (5th Cir. 2005) (listing circumstances indicating coercion in the context of a criminal confession).  In examining the voluntariness of the waiver, the court must determine if the waiver is the "product of the accused's free and rational choice, and thereby voluntary."  *United States v. Anderson*, 755 F.3d 782, 790 (5th Cir. 2014) (discussing coercion in the criminal context) (citing *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004)) (internal quotation marks omitted).

The Plaintiffs have clearly offered evidence of Laura S.'s reason for fearing a return to Mexico and that Agent Garza knew about her fear.  Cardiel, Alvarez, and Morales testified that Laura S. told Agent Garza that she feared returning to Mexico because she believed that Sergio H. would kill her.  The group testified that Laura S. was crying, begging, distressed, and anguished.  Cardiel testified to Laura S.'s ominous statements as they approached the Hidalgo-Reynosa Bridge as they were being removed.  Plaintiffs have attached Laura S.'s protective order

---

[20] Consent issues most frequently arise in the context of criminal cases involving a search by law enforcement.  The Fifth Circuit has outlined the following primary—but not dispositive—factors by which to determine whether consent to a search is knowing and voluntary: (1) the voluntariness of the defendant's custodial status, (2) the presence of coercive police procedures, (3) the extent and level of the defendant's cooperation with police, (4) the defendant's awareness of his or her right to refuse consent, (5) the defendant's education and intelligence, and (6) the defendant's belief that no incriminating evidence will be found.  *United States v. Galberth*, 846 F.2d 983, 987 (5th Cir. 1988).  Though these factors are obviously relevant in a criminal context, and some of these factors do not apply to Laura S.'s detention, the Court will nevertheless use them as guideposts.

[21] Though the mental condition of a criminal defendant is relevant to voluntariness, "a defendant's mental condition, by itself and apart from its relation to official coercion will not dispose of the inquiry into constitutional voluntariness."  *Sosa*, 133 Fed. Appx. at 119 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)) (internal quotation marks omitted).

against Sergio H., and Cardiel, Alvarez, and Morales each averred that Laura S. told Agent Garza about the existence of the protective order.[22]  According to Alvarez, before Laura S. was killed, she was trying to raise money to come back to the United States.  While Defendants do not openly concede that Laura S. had a true and justifiable fear about returning to Mexico, they certainly do not, at least at this juncture, claim that they are entitled to summary judgment based upon their lack of knowledge of the possibility of harm.

Although the parties engage in many factual disputes, their briefing seems to focus on whether Laura S. voluntarily *signed* Form I-826.  That is not necessarily the controlling issue. The critical issue is whether Laura S. was coerced into checking the box associated with voluntary return rather than one of the other two boxes on Form I-826, either of which would have referred Laura S. to an immigration judge.  Laura S. would have had to sign Form I-826 had she selected any one of the other options.  The Plaintiffs' endeavor to fracture the shield of qualified immunity rests entirely on Plaintiffs' ability to raise a fact issue showing that Laura S. was forced into checking the only box on Form I-826 that would not have resulted in further processing in the United States.

In summary, Plaintiffs identify the following evidence they claim proves, or at least raises a fact issue, that Laura S. was forced into signing Form I-826 at the CBP processing

---

[22] The Defendants maintain that Laura S. would not have qualified for immigration status adjustment through the Violence Against Women Act ("VAWA") because both she and Sergio H. were in the country illegally.  Under one provision of VAWA, an alien who is a spouse of a United States citizen or lawful permanent resident may self-petition for immigration status adjustment if the alien was subjected to battery or extreme cruelty by his or her spouse.  8 C.F.R. § 204.2; *see* 8 U.S.C. § 1154(c).  The petitioner may include evidence of the abuse suffered which includes a protective order.  8 C.F.R § 204.2(c)(2)(iv).  If the petition is approved by the Department of Homeland Security ("DHS"), the alien's status may be adjusted to that of a lawful permanent resident.  *See* 8 U.S.C. § 1255(a). Laura S. did not qualify for discretionary cancellation of removal and status adjustment under U.S.C. § 1229b, also created by VAWA.  *See Garcia-Mendez v. Lynch*, 788 F.3d 1058, 1062 (9th Cir. 2015) (discussing the differences between a VAWA self-petition and discretionary cancellation).  Under U.S.C. § 1229b, an alien who is deportable from the United States may be eligible for status adjustment to that of a lawful permanent resident if the qualifying alien can show that he or she has been battered or subjected to extreme cruelty by a spouse who is or was a United States citizen or lawful permanent resident.  *See* 8 U.S.C. § 1229b(b)(2); *Hernandez-Grado v. Gonzales*, 159 Fed. Appx. 562, 564 (5th Cir. 2005).  Sergio H. was not a United States citizen or a lawful permanent resident.

center: (1) Laura S. refused to sign the form twice, (2) Agent Garza and the other agents present at the processing center were armed, (3) Laura S. was not free to leave the processing area, (4) Laura S. stated that the circumstances of the detention were an "injustice," (5) Agent Garza and another agent were "ordering" Laura S. and Cardiel about, (6) Agent Garza and the other agent told Laura S. and Cardiel that they "had to go to Mexico," (7) Agent Garza used a "high volume voice," (8) Agent Garza looked annoyed, (9) Agent Garza was in a hurry and did not give Laura S. time to read Form I-826, (10) the agents pointed firmly to the signature lines on the I-826 forms and told Cardiel and Laura S. that they had to sign, (11) Cardiel signed because Agent Garza was armed, she could tell that the agents "wanted to throw [her] back," and because Cardiel felt that she had "no choice," and (12) Agent Garza "mock[ed]" and laughed at Laura S. when Laura S. told Agent Garza about her fear of returning her Mexico.[23]

The Plaintiffs' argument essentially boils down to this: if Laura S. was so scared of returning to Mexico, why would she sign a document agreeing to her own deportation *unless* she was coerced?  Agents Garcia and Garza both testified that they did not remember any specific expression of fear, but had Laura S. expressed a fear of returning to Mexico or had she not voluntarily agreed to her own return to Mexico, she would have been kept in the United States and eventually would have been brought before an immigration judge.  From this, the Plaintiffs conclude that Laura S.'s acceptance of being removed had to be the product of coercion.  While this argument is not illogical, it is nonetheless argument and not evidence.  Furthermore, it is not

---

[23] The Plaintiffs also argue that Laura S.'s signature on Form I-826 was markedly different than her signature on her Matricula Consular Identification Card, which, according to Plaintiffs, suggests that she wrote her name under the extreme stress of coercion.  [*See* Pls.' Ex. 10, Doc. No. 124–11 at 4; Ex. 11, Doc. No. 124–12 at 3].  A Matricula Consular Identification Card is an ID card issued to Mexican nationals living in the United States.  *See* U.S. Gov't Accountability Off., GAO–04–881, *Border Security Identification Cards Accepted within United States, but Consistent Federal Guidance Needed* 5 (2004), http://www.gao.gov/new.items/d04881.pdf (last visited July 7, 2017).  This is a wholly conclusory statement to which Plaintiffs provide no supporting evidence.  The Plaintiffs' claimed discrepancy is not self-evident, nor is there any expert comparison of the signature on Laura S.'s Form I-826 and the one on her Matricula Consular Identification Card.

the only logical deduction that one can draw from the evidence.  She just as easily could have checked the box that would get her released the quickest because she was worried about her children, especially the child in need of medical care.

The Plaintiffs have certainly created a fact issue as to whether Laura S. told Agent Garza about her fear of returning to Mexico.  Nevertheless, to prevail at this stage on the issue of qualified immunity, Plaintiffs need to create a fact issue as to whether Laura S.'s agreement to be removed was the product of coercion.

i.      Laura S.'s Physical and Mental Condition

The Plaintiffs have not introduced competent evidence that Laura S.'s maturity, education, and physical condition played a role in their claim of coercion.  The uncontroverted testimony is that Laura S. was intelligent.  There is no evidence that Laura S. could not read the Spanish translation of Form I-826.  Laura S. had been previously removed twice.  Cardiel testified that Laura S. understood that signing the I-826 form meant she would return to Mexico, [Cardiel Dep. 46:13–16], a fact that Plaintiffs admit.  [Pls.' Resp., Doc. No. 123 at 29].

Further, there is no evidence that Laura S. was mentally impaired at the time she signed Form I-826 or any evidence that the agents overcame Laura S.'s will in a manner that suggests that her critical faculties were in any way disabled.  *See Brady v. United States*, 397 U.S. 742, 750 (1970) (finding that there was no evidence that the defendant was "so gripped by fear of the death penalty or hope of leniency that he did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty" as to render the defendant's plea involuntary).

According to the summary judgment evidence, Laura S.'s fear of returning to Mexico was due in large part to the presence of Sergio H.  Though certainly a source of distress and

relevant to the totality of the circumstances analysis, this was a threat that predated her interaction with Agent Garza and the other agents at the processing center.  The danger Sergio H. posed was not introduced or created by Agent Garza or any other agent.  Moreover, some level of general distress is linked to the deportation of any individual, who, like Laura S., was once again faced with removal after prior unsuccessful attempts to enter and remain in the United States illegally.  The Plaintiffs provide no evidence to suggest that Agent Garza or any other agent exacerbated Laura S.'s fear of Sergio H. to somehow influence Laura S.'s decision to choose the voluntary return option.

ii.      The Circumstances of the Detention

The Plaintiffs have not provided competent summary judgment evidence indicating the existence of coercion resulting from the length, location, or manner of her detention.  Cardiel testified that neither she nor Laura S. was restrained.  Even had Cardiel and Laura S. been handcuffed, which they were not, such a factor would not necessarily tip the legal balance towards coercion.  *See United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir. 2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression."); *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) (defendant's statement consenting to search made while he was under arrest, in handcuffs, in a dazed state, and in the presence of at least five to seven federal agents was not the product of coercion).

The entire process was devoid of physical hardship and Cardiel averred that it only took between 20 or 30 minutes.  The location of the detention, at the CBP processing center in Weslaco, was the standard location to process aliens who were unlawfully present in the United States, and there is no evidence that those facilities played any role in coercing Laura S., Cardiel,

or Morales to opt for a return to their native country.  The Plaintiffs suggest that the Court should look to the restriction on Laura S.'s ability to leave the detention center.  Laura S. was in the country illegally and subject to being detained.  Moreover, some form of restraint is present in every detention.  That factor, in and of itself, does not rise to coercion.  There is no evidence that the circumstances of the detention in this case were in any way coercive.

The fact that the officers had uniforms and carried firearms does not equate to coercion. Under Fifth Circuit precedent, where officers were not pointing their firearms at the defendant and were not threatening the defendant or shouting, the "mere presence of armed officers [did] not render a situation coercive."  *United States v. Martinez*, 410 Fed. Appx. 759, 764 (5th Cir. 2011).  Further, the case law suggests that the fact that Agent Garza and the other agents were armed or using a "high volume voice" should not be assigned significant weight towards a finding of coercion.  *See United States v. Jones*, 359 F.3d 921, 923–24 (7th Cir. 2004) (finding a postal employee's confession voluntary where a postal inspector questioned the employee with a raised voice for approximately one hour while a second inspector was visibly armed).

From a practical standpoint, if one can raise the specter of coercion from mere interaction with an authoritative and armed officer, even the most mundane of encounters with law enforcement could implicate a due process violation.  Simply because Agent Garza was armed or looked annoyed (Cardiel testified that Agent Garza "looked like" he wanted to throw Cardiel and Laura S. back) does not mean that he coerced Laura S.  This is especially true where the uncontroverted evidence is that no agent ever unholstered his or her weapon or in any fashion overtly threatened Laura S.  *See Anderson*, 755 F.3d at 791 (ruling that a confession was not involuntary where the defendant "was not handcuffed during the interview, the officers never displayed any weapons, and they never placed their hands on him.").

The Plaintiffs also claim that Laura S. was not given enough time to read Form I-826. Cardiel testified that she overheard Agent Garza say that he was in a rush and that he had to leave.  [Cardiel Dep. 43:7–10].  Based upon this statement, Plaintiffs argue that Laura S. was pressured into signing the form without adequate time to consider her options.  Yet, according to Cardiel's testimony, the duration of time involved between the time the agents presented the one-page Form I-826 to each women and the time when Cardiel and Laura S. signed the form was between 20 and 30 minutes.  [Cardiel Dep. 47:10–13].

The Supreme Court has recognized that involuntariness can stem from "psychological pressure," *Withrow v. Williams*, 507 U.S. 680, 708 (1993), a category that this Court understands may include time pressure, conceptually similar to the argument Plaintiffs allege here.[24]  The degree of time pressure needed to raise the specter of involuntariness is obviously relevant to the totality of the circumstances analysis.  For example, there is considerable time pressure imposed on a defendant in the context of a plea agreement—yet plea agreements made under such pressure are routinely held up against due process objections in the criminal context (where criminal defendants are afforded greater protections of their rights).  *See United States v. Marrero–Rivera*, 124 F.3d 342, 350 (1st Cir. 1997) ("the strategic decision to plead guilty [is] not [necessarily] rendered involuntary by the anxieties and time pressures confronting [the defendant].").

The Defendants, relying on two cases out of the Seventh Circuit, respond that Plaintiffs' claim that Laura S. was rushed into signing is legally insufficient evidence of coercion.  In *United States v. Baptist*, the plaintiff, an alien subject to removal due to a prior felony drug trafficking and controlled substance offense conviction, waived his right to appear before an

---

[24] In cases dealing with involuntary retirement allegations made by federal employees, courts have ruled that time pressure, in and of itself, does not make a decision to retire involuntary unless it also interfered with the employee's ability to make an informed choice. *See, e.g.*, *Paul v. Dep't of Navy*, 217 F.3d 860 (Fed. Cir. 1999).

immigration judge and instead signed a stipulation agreeing to removal.  759 F.3d 690, 693 (7th Cir. 2014).  As evidence for why his waiver was involuntary, the plaintiff claimed that he was told by an immigration officer to "hurry up and sign [the form] if he wanted to go back to Belize."  *Id.* at 696.  The *Baptist* court indicated that the statement was not competent evidence of coercion as the plaintiff never "assert[ed] that anyone tricked or pressured him into signing the form."  *Id.*

*Henn*, the second case cited by Defendants, addressed 12 employees' acceptance of early retirement in the context of an age discrimination case.  *Henn v. Nat'l Geographic Soc.*, 819 F.2d 824, 826 (7th Cir. 1987).  The court was tasked with reviewing whether the employees voluntarily agreed to early retirement or whether the retirement was actually a discharge, and thus, a potential violation of the Age Discrimination in Employment Act.  *See id.*  The *Henn* court ruled that time pressure was not a factor for the employees as every one of them had time to consult both their spouses and financial advisors about the early retirement option.  *See id.* at 829.  Though *Henn* articulates a worthwhile principle, it does not as a matter of law dispose of Plaintiffs' claim that the time pressure exerted on Laura S. could be a legally relevant factor in the involuntariness calculus, especially given the fact that Laura S. was processed during the wee hours of the morning and no advisors were at hand.

The Court does not find either of the cases Defendants cite to be compelling, particularly the *Henn* case since its relevant facts are so dissimilar to the case at hand.  It is clear to the Court that time pressure can be competent evidence of coercion especially when it is intertwined with other classic signs of coercion.  *See Paroczay v. Hodges*, 297 F.2d 439, 440 (D.C. Cir. 1961) (threat of a lawsuit); *Angarita v. St. Louis County*, 981 F.2d 1537, 1545 (8th Cir. 1992) (threat of severe public embarrassment); *Middleton v. Dep't of Def.*, 185 F.3d 1374, 1380–81 (Fed. Cir.

1999) (potential imposition of intense health-related burdens), *Tatum v. Axxis Drilling, Inc.,* CIV.A. 08-1237, 2009 WL 4277241, at *1, 9 (W.D. La. Nov. 30, 2009) (flagrant misrepresentations about the plaintiff's rights).

A subjective suggestion of time pressure without some objective indicia of coercion is not competent evidence of involuntariness. *See, e.g.*, *Evans v. Asian Am. Recovery Services*, C-08-0944 EMC, 2008 WL 5273748, at *4 (N.D. Cal. Dec. 19, 2008) (rejecting plaintiff's claim that her rushed settlement agreement was the product of coercion where there was no objective indications of coercive pressure on plaintiff). Form I-826 is a one-page document. [*See* Defs.' Ex. 2, Doc. No. 119–2 at 4]. Moreover, Laura S. had seen the same or similar form on prior run-ins with CBP. The Plaintiffs have certainly not provided any evidence of the more recognized forms of coercion, or that Laura S. was ever emotionally abused (separate and apart from the anxiety she might have experienced at the prospect of deportation) or physically threatened. Consequently, the weight of the time pressure factor towards a finding of involuntariness— though nonetheless relevant—must be somewhat reduced. This is especially true in this situation where all Laura S. had to do was check a different box and she would have been kept in custody until she was brought before an immigration judge.

"The absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent." *Jones*, 475 F.2d at 730. Without objective indicia of coercion, almost every factor this Court is tasked to weigh stems from Cardiel's testimony. Cardiel, herself, could not settle on a reason for why chose the option she did on Form I-826. Cardiel gave four different reasons for why she ultimately selected voluntary return: (1) that the agents were armed, (2) that she did not want to be detained for a long period of time, (3) that the agents looked like they wanted to get

her back to Mexico, and (4) that she felt that she had no other choice.  Cardiel's testimony about her own subjective mindset is of little relevance as to why Laura S. decided to sign given the lack of objective evidence that either Cardiel or Laura S. was physically or emotionally threatened.[25]

Moreover, to the extent it is relevant, Cardiel, herself, testified that she did not think Agent Garza would hurt her, but to the contrary, was worried that Agent Garza would detain her for a long period of time.  [Cardiel Dep. 71:1–8]; *see Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988) (explaining that the mere fact that the choice is between comparably unpleasant alternatives does not establish that a choice is involuntary).  Ironically, Plaintiffs' position in the instant case is just the opposite as Cardiel's.  Their contention is that Laura S. should have been detained for a longer period of time and eventually brought before an immigration judge.[26]

The evidence that the agents "mock[ed]" Laura S. (to which Plaintiffs provide no legal authority as to its role in voluntariness), that Laura S. initially refused to sign Form I-826, the circumstances of the detention, the so-called time pressure, that the agents ordered that Laura S. and Cardiel sign Form I-826, and that the agents told the pair that they "had to go to Mexico" is unaccompanied by even a single instance of "actual or threatened physical harm or by mental coercion overbearing the will of the defendant."  *Brady,* 397 U.S. at 750.

At the risk of repetition, there is not a shred of evidence that suggests that Laura S. was threatened, physically forced, mentally overpowered, or in some way or another, deprived of her choice to check the box next to either of the two options on Form I-826 that would have referred

---

[25] Obviously for summary judgment purposes, the Court accepts all this testimony, some of which is contradictory, as true.
[26] The decedent's position that night was that she wanted to be outright released—a result to which she was not entitled.  The Plaintiffs have not argued that position in their responses.

her case to the immigration judge—options that were also available to her on nearly identical forms that she received when she was repatriated to Mexico in 2002 and 2005. There is no evidence that her signature on Form I-826 was falsified or manipulated. *See generally Lanuza v. Love*, C14-1641 MJP, 2015 WL 1282132, at *2 (W.D. Wash. Mar. 20, 2015) (ruling that an immigration officer was not shielded by qualified immunity in a *Bivens* suit as he submitted a falsified Form I-826). At no point was either Laura S. or Cardiel forced to put ink to paper. *See Reyes-Rojas*, 644 Fed. Appx. at 725 (substantial evidence supported the determination that an alien knowingly and voluntarily accepted voluntary departure where there was no evidence of overt misrepresentation or intimidation by immigration officers).

The I-826 form listed Laura S.'s options in Spanish. Among the options presented, Laura S. could have requested a hearing before the immigration court to see if she could remain in the United States. Alternatively, Laura S. could have indicated that she believed she would face harm if she returned to Mexico, and accordingly, had her case referred to an immigration judge. Laura S. did not select either of those options—both of which would have allowed her to stay in the United States for further processing. Instead, Laura S. checked the voluntary return option which she knew from prior experience and from the statements of the agents would get her released and deported. Both Laura S. and Cardiel had been previously removed. *See Anderson*, 755 F.3d at 791 ("Anderson had significant contact with law enforcement prior to the instant arrest. His experience with the criminal process makes it less likely that his confession was involuntary.").

It could have been the case that Laura S., like Cardiel, did not want to be detained for a lengthy period of time and planned on returning to the United States within days of her repatriation (which is exactly what Cardiel said at one point was her motivation and which she

actually did).  The circumstances certainly suggest that motivation as much as it does submission

to coercion.  Cardiel was not afraid of physical harm at the hands of the agents, but instead

thought that the agents would "lock [her] in for a long period of time."  [Cardiel Dep. 71:1–8].

Cardiel testified that she felt threatened because she "didn't want to be locked in because [she

had] children."  [*Id.* at 72:5, 73:1–2].  By her own admission, Cardiel signed the document

because it was the fastest way to be released from custody.  [*Id.* at 73:3–5].

      Like Cardiel, Laura S. had children.  In fact, Agent Garza allowed Laura S. to make a

phone call to the children's grandmother to make "suitable arrangements for [their] care and well

being . . . ."  [Defs.' Ex. 2, Doc. No. 119–2].  Laura S. could have wanted the faster way to

freedom so she could reunite with her children (one of whom needed a medical operation) as

quickly as possible.  Apparently, Cardiel performed a "cost-benefit" analysis of her available

options: she could return to Mexico within hours of her detention, and at her prerogative, swim

back over to the United States to be with her children—or she could go through a detention

process which by necessity would require her to remain in custody.  What is to say that Laura S.

did not evaluate her alternatives similarly?

      The problem with this entire analysis into Laura S.'s motivation is that it is built on a

mountain of speculation.  Cardiel does not know why Laura. S. signed.  [Cardiel Dep. 46:24–25,

47:1–3].  Laura S.'s decision to check the voluntary return box could have been based on any of

the reasons mentioned above or a reason that neither side has suggested.  The obstacle

hamstringing Plaintiffs' claim that Laura S. was forced to select voluntary return is that

Plaintiffs' primary witness has not identified even a single instance where Agent Garza or any

other agent physically or emotionally coerced Laura S. or directed her to check the box she did

on the I-826 form.  The Court has discussed the latter point to exhaustion because it is the key issue controlling the question of governmental immunity.

iii.    Absent Direct Evidence, Does the Totality of the Circumstantial Evidence Raise a Material Issue of Fact Supporting Coercion?

Since no one provides evidence of direct coercion, and since none of the factors discussed above individually demonstrate coercion, the Court is left with having to decide whether the following pieces of circumstantial evidence, which considered together, raise a fact issue as to whether Laura S. was forced to agree to voluntary return:

(1) Agent Garza "mock[ed]" and laughed at Laura S.;

(2) The agents pointed firmly at Form I-826 in a strong manner;

(3) The agents ordered Cardiel and Laura S. to sign Form I-826 in a high-volume voice;

(4) That Laura S. was under mental strain due to her fear of returning to Mexico;

(5) Laura S. verbally refused to sign the form twice and stated "this is an injustice";

(6) At some point in time, the agents told Laura S. and Cardiel that they "had to go to Mexico"; and

(7) That Cardiel signed because she felt she had "no choice" (but of course she also signed because she did not want to be detained for a lengthy period of time).

The most difficult question in this case (at least so far) is whether these threads of circumstantial evidence, which must be accepted as true in considering a summary judgment motion, when woven together create an issue of material fact as to whether Agent Garza

"coerced" Laura S. into filling out the I-826 form in the manner she did.[27]   The most supportive

factors presented by the Plaintiffs include: (1) the use of an authoritative voice, (2) the pointing

at the Form I-826 combined with the instruction to sign the form, and (3) the statement that they

(Laura S. and Cardiel) needed to go to Mexico.

The other factors, such as Laura S. claiming the situation was an "injustice" and her

numerous requests to be released, while giving context, are not evidence of coercion.  They are

certainly proof that Laura S. did not want to be detained or deported.  While she had valid and

compelling reasons for not wanting to be detained or deported, she had no legal right to simply

be released.  The fact that Agent Garza (or any of the other agents for that matter) did not release

her is not evidence of coercion.  The mental strain evidenced by the various statements attributed

to Laura S. is certainly understandable as she was faced with having to choose between two

alternatives (immediate return to Mexico or prolonged detainment awaiting further immigration

proceedings), neither of which were desirable from her standpoint.

Again, these alternatives were not created that night by the agents.  They were created by

the applicable law, by the agents' duty to enforce that law, by the prior choice of Laura S. to

reside in the United States illegally (as opposed to legally immigrating to the United States or to

some other country or moving to some other part of Mexico far away from Sergio H.), by Sergio

H. (whose uncontrollable rage eventually led to death of Laura S.), and by her belief (a belief

that turned out to be accurate) that the local Reynosa law enforcement authorities could not

---

[27] Since the case law dictates that the question of qualified immunity must be resolved first, this Court has not yet
had to address the many thorny legal issues waiting in the wings, including the difficult question of proximate cause.
The issue of proximate cause, which was alluded to in the current motions, will contain multiple questions including
whether the act of a CBP agent in expelling an illegal alien can proximately cause an event which was effectuated
by a third person committing a crime in a different country many days after the alien was removed from the United
States.  This issue will provide the Court with a more complicated scenario than that considered in the classic
*Palsgraf* case.  *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339 (1928).

adequately provide protection for one of its own citizens.  As stated before, all these factors provide context, but they are not necessarily evidence of wrongdoing by the agents.

Despite the lamentable circumstances that seemingly surround every aspect of this case, the crux of the matter seems to narrow to the question of why Laura S. chose the voluntary return option on the Form I-826 instead of opting for one of the other two options which would have resulted in her remaining in CBP custody.  Perhaps Laura S. did not want to remain in custody and thought this option was her fastest route to freedom and ultimately reuniting with her children.  Perhaps she chose that route because Cardiel did.  Perhaps she mistakenly marked the wrong option.  Perhaps she chose that option for a totally different reason that none of the parties have suggested.

The pivotal point for this Court is that even when the Court considers the totality of the evidentiary picture, it can not conclude that there is evidence that Agent Garza acted in an objectively unreasonable manner.  Stated differently, the Court can not conclude that there is evidence that Agent Garza coerced Laura S. into choosing the voluntary return option.  This Court is not unsympathetic with the quandary that Plaintiffs and their counsel face in combatting the government's Motion.  The only person who can truly reveal Laura S.'s motivation was killed.  As such, the best evidence Plaintiffs can cobble together is that derived from those who were with her the night in question and for the following week.  The Court has described at length the results of those efforts above.  Nevertheless, it holds that even when one considers the totality of the circumstantial evidence, the evidence does not create an issue of material fact that would defeat Agent Garza's defense of qualified immunity.

## V. Conclusion

To advance this lawsuit, the Plaintiffs needed to raise an issue of triable fact that: (1) Agent Garcia was personally involved in the violation of Laura S.'s constitutional rights and that his conduct was objectively unreasonable, and/or (2) that Agent Garza's conduct was objectively unreasonable such that he would not be protected by the defense of qualified immunity. Plaintiffs have not, as required to sustain a *Bivens* claim against Agent Garcia, created a fact issue as to whether Agent Garcia was acting in any capacity other than a supervisorial one at the CBP processing center on the night in question or that he ever acted in an untoward manner. The Court grants his summary judgment motion. Despite their best efforts, Plaintiffs have failed to clear the evidentiary hurdle created by the death of Laura S. and consequently have failed to create a fact issue as to whether Agent Garza coerced Laura S. into selecting the voluntary return option on Form I-826. That being the case, the Plaintiffs have not created an issue of material fact as to whether Agent Garza acted in an objectively unreasonable manner so as to deprive him of the defense of qualified immunity at this juncture in the proceeding. The Court therefore holds that Agent Garza is immune from Plaintiffs' suit. Per *Celotex*, the Court hereby grants Defendants' Motion for Summary Judgment [Doc. No. 118]. Pursuant to Fed. R. Civ. P. 58(a), the Court will issue a final judgment in this case in a separate document.

Signed this 21st day of July, 2017.

Andrew S. Hanen
United States District Judge

49